247 A.2d 303.

DIANE PONTICELLI *vs.* MINE SAFETY APPLIANCE CO.
DIANE PONTICELLI *vs.* ROLAND DEMERS.
DIANE PONTICELLI *vs.* MINE SAFETY APPLIANCE CO.

NOVEMBER 4, 1968.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

JOSLIN, J. Each of these three cases is here on the plaintiff's appeal from a judgment which entered following the direction of a verdict for the defendants by a superior court justice. Two of the cases, one for slander and the other for libel, are against the corporate defendant; the third, against the individual defendant, is for slander. The plaintiff has expressly waived her appeal in the libel action, and therefore we consider only the two slander actions.

Viewing the evidence and the reasonable inferences therefrom in the light most favorable to plaintiff and without regard to any question of credibility, — a practice we must follow in the posture of these cases — it appears that plaintiff had been employed for several years by the corporate defendant, a manufacturer of gas masks. She worked in a production line as a trimmer of filters. She was paid on a piece work, rather than an hourly basis, and recorded her production figures on a work card.

Demers, the individual defendant, was the supervisor of the second shift. The plaintiff worked that shift. On March 30, 1964, Demers called her to his office, accused her of "pushing a pencil," and directed her to report to the personnel manager. When she reported on the following day as directed, she was advised that her employment was terminated. By that time Demers had already told plaintiff's five or six co-workers on the production line that she had been discharged because she had been caught "pushing

a pencil." That expression is the plant vernacular for padding production figures.

The plaintiff agrees that the totals shown on the work cards turned in by her exceeded the units she had actually produced, but explains the discrepancies by saying that the figures shown on her work cards had been altered. She disclaims responsibility for those alterations and denies, of course, that she falsified her production records.

As briefed and argued by the parties, the issues are whether Demers' statement to plaintiff's co-workers that she had been "pushing a pencil," was qualifiedly or conditionally privileged, and if so, whether defendant in uttering those words was motivated by malice toward plaintiff.[1]

Preliminarily, we examine the qualified privilege concept. It permits a person to escape liability for a false and defamatory statement made about another if the occasion for the publication is such that the publisher acting in good faith correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third persons, or certain interests of the public. The occasion, of course, must not be abused. Underlying the principle is the public policy consideration that unless such an occasion is privileged, persons would not speak, even though the interests of the community at large required that they do so, lest they be exposed to a suit for defamation for what they might say. Correlatively, of course, there must be a reciprocity of duty between the publisher and the person to whom the publication is addressed, and the circumstances should reasonably demonstrate that the recipients have an interest in receiving it corresponding to that of the publisher in making it. *Hayden* v. *Hasbrouck*, 34 R. I. 556,

---

[1]The question of whether the corporate-defendant was responsible for a defamatory statement by its agent was not briefed and argued, and is, therefore, not considered.

560, 84 A. 1087, 1089; 3 Restatement, *Torts,* Topic 3, *Conditional Privilege, Scope Note,* pp. 240-41; *Gately, Libel and Slander* (6th ed.) §443, pp. 202-03.

Well established as within the scope of the principle are those occasions where the communication acquires its privilege because it is between persons who have a common interest in a particular subject matter. Examples of this type of communication are found in *McKnight* v. *Hasbrouck,* 17 R. I. 70, 20 A. 95, where the defendant, a physician, in pursuance of what he claimed was his duty, wrote to the secretary of his medical society concerning a fellow member; and in *Hayden* v. *Hasbrouck, supra,* where a report was circulated to officers of a subordinate club by the president of a state women's club concerning an investigation made of a fellow member's misconduct. Still another occasion for the privilege may be the publication by an employer to some or all of its employees of matters relating to the misconduct of another employee. Although no decisions of this court have recognized such an inter-company communication as privileged, the authorities generally give them that status, provided they are uttered by the defamer in an effort to protect or to recover its property and provided further that the publication has been limited "* * * to persons reasonably calculated to assist the owner in obtaining the return of the property or to prevent further losses * * *." Harper & James, *Torts,* §5.26, pp. 443-44.

The plaintiff, while agreeing that there may be occasions when the inter-company communications will be qualifiedly privileged, argues that in this case her co-workers had no interest which justified their being told the reason for her discharge. She relies primarily on *Sias* v. *General Motors Corp.,* 372 Mich. 542, 127 N.W.2d 357. There a plant protection guard was charged with misappropriating property and voluntarily resigned in order to avoid being discharged. In order to still rumors which were damaging to morale,

management called in several plant protection men selected at random and, in the course of explaining to them why the plaintiff had "resigned," said that he had been released for misappropriating company property. That communication, the court held, was made to restore plant morale which had been adversely affected by the rumors and therefore was in the company, rather than in the common interest. It recognized, however, that the plaintiff's supervisors, or the personnel department representatives, or the appropriate company officials, as distinguished from a random selection of employees in the department where the plaintiff worked, might have had the prerequisite interest. *Thalhimer Bros.* v. *Shaw*, 156 Va. 863, 871, 159 S.E. 87, 90, also relied on, turns on defendant's having repeatedly charged the plaintiff with theft in such a manner that the accusation was disseminated to employees who had no common interest in having that report communicated to them.

The defendants, on the other hand, insist that the circumstances of this case are such that they shared with the recipients an interest in the communication of the defamatory matter. The common denominator, they say, was an acceptance of the principle that falsification of production records by an employee would result in the termination of his employment. Disclosure of plaintiff's conduct was to defendants' interest because notice that plaintiff had been discharged for padding her production figures would discourage the others from following suit and would assist in preventing future losses. And disclosure was also to the interest of the co-employees because it made clear to them that they too would be discharged if they "pushed the pencil."

To support their position defendants cite *Gately, supra.* He refers at 513 to the English case of *Hunt* v. *Great Northern Ry.*, 2 Q.B. 189 (1891). There in a printed monthly circular, an employer advised its servants that the plaintiff

had been dismissed for gross neglect of duty. The Court of Appeals found that the occasion was qualifiedly privileged and Lord Esher, M. R. said at 191:

"* * * Can any one doubt that a railway company, if they are of the opinion that some of their servants have been doing things which, if they were done by their other servants, would seriously damage their business, have an interest in stating this to their servants? And how can it be said that the servants to whom that statement is made have no interest in hearing that certain things are being treated by the company as misconduct, and that, if any of them should be guilty of such misconduct, the consequence would be dismissal from the company's service? I cannot imagine a case in which the reciprocal interest could be more clear."

Other authorities which defendants cite are not as strong as the *Hunt* case. Thus, in both *Sokolay* v. *Edlin,* 65 N. J. 112, 167 A.2d 211 (Super.Ct.), and *Combes* v. *Montgomery Ward & Co.,* 119 Utah 407, 228 P.2d 272, the recipients of the communications, having themselves been suspected of the kind of misconduct with which the plaintiffs had been charged, had an interest in being advised of the outcome of their respective employers' investigations; in *Stephenson* v. *Marshall,* 104 F.Supp. 26, communication of the reasons for the plaintiff's dismissal was not volunteered, but was instead given in response to a request for information from fellow employees; and in *Hall* v. *Rice,* 117 Neb. 813, 223 N.W. 4, the fellow employee-recipients were interested in learning that the plaintiff had been charged with failing to ring up sales on the company cash registers because those registers "* * * were used by all of the employees at one time or another, and each employee had a personal interest in the honesty of every other, for if one is dishonest suspicion may be cast upon all." 117 Neb. at 818, 223 N.W. at 6.

Without need of examining further into the authorities or attempting to distinguish them, it is obvious that the

question of whether or not a communication by an employer to his employees concerning a fellow employee's misconduct is qualifiedly privileged will turn on the particular fact situation of each case. The determination of whether on those facts the privilege exists is exclusively legal and is for the court, and not for the jury. 3 Restatement, *Torts,* §619; Newell, *Slander and Libel,* (4th ed.) §345 and §395; *Peoples Life Ins. Co.* v. *Talley,* 166 Va. 464, 186 S. E. 42; *Combes* v. *Montgomery Ward & Co., supra.* And the test is whether in order to protect a common interest an employer either correctly or reasonably believes that a plaintiff's co-workers are entitled to be advised of the nature of his misconduct. 3 Restatement, *Torts,* §596.

Applying that test to the facts of this case, we are satisfied that Demers correctly or reasonably and in good faith concluded that the interest he had in protecting his employer from being defrauded required that he share the reasons for plaintiff's discharge with a limited group of co-workers who might thereby be discouraged from engaging in similar practices. An additional circumstance giving rise to his belief was the credits which other employees claimed on their work cards for the same unit which plaintiff claimed on her card that she had produced. Pending a resolution of the reasons for their overlapping claims, the finger of suspicion could reasonably have pointed, not alone at plaintiff, but at her co-workers as well. Once those suspicions were resolved the fellow employees were entitled to learn that responsibility for the discrepancies had been charged to plaintiff and not to them. *Hall* v. *Rice, supra.*

There remains the further problem of whether defendant unreasonably exercised the privilege. Clearly, of course, an occasion otherwise conditionally privileged cannot be sustained if the defamatory statements have been induced by malice. *Tillinghast* v. *McLeod,* 17 R. I. 208, 21 A. 345. The word "malice" as we use it "* * * does not mean malice

■■■■■■■■■■■■■■■■■ ■

in law, or the absence of legal excuse, but malice in the popular sense, the motive of personal spite or ill will. This is sometimes called express or actual malice." *Hayden* v. *Hasbrouck, supra,* at 562, 84 A. at 1089-90.

Ordinarily malice in this sense is presumed from the defamatory nature of the publication and a defamed person may rely upon that presumption without the necessity of offering proof. Where, however, the communication is privileged, the presumption ·disappears and is replaced by one of good faith. It then becomes the defamed person's obligation to prove express malice. *Hayden* v. *Hasbrouck, supra.* To support his burden he must show that the primary motivating force for the communication was the publisher's ill will or spite toward him. Where, however, the causative factor was the common interest, a publisher's resentment toward the person defamed is immaterial and any incidental gratification is without legal significance. *Boston Mutual Life Ins. Co.* v. *Varone,*[2] 303 F.2d 155, 159; *Coleman* v. *Newark Morning Ledger Co.,* 29 N. J. 357, 375, 149 A.2d 193, 202; Prosser, *Torts* (3d ed.) §110, pp. 821-22.

Whether ill will or spite is the incentive for a publication is ordinarily for the jury to decide unless, of course, on the facts the only reasonable conclusion that can be reached is that the ill will or spite, if indeed they existed, were merely incidental rather than motivating in which event a verdict should be directed for the defendant. 3 Restatement,

---

[2]The principle that noncausative ill will does not destroy the privilege is tested in *Varone* by the following illustration. Two newspapers having opposite political views each published the obviously newsworthy and therefore privileged account of the arrest of a high public official for larceny. The paper whose political leanings were anti-plaintiff did so with joy; the other with sorrow. Obviously in those circumstances the purely fortuitous gratification which the opposition press may have gained from the publicity it gave the official's difficulty does not mean that its motives were improper or that it acted out of spite and therefore maliciously.

*Torts,* §619(2). See *Sylvester* v. *D'Ambra,* 73 R. I. 203, 54 A.2d 418.

The plaintiff attempts to show malice here by calling our attention to an incident which occurred about two years prior to the defamatory publication.[3] She was then employed as an assembler cleaning filters, rather than as a trimmer, and was doing what she described as extremely dirty work. She requested Demers to transfer her to another department. When he refused, she went over his head to his superior who granted her request. She also refers us to Demers' testimony that she was not a good worker. That testimony, she says, is in sharp contrast with the es-

---

[3]There are 901 pages of transcript in the record. The incident which plaintiff relies on was testified to by Demers who was called by plaintiff as an adverse witness, and as called to our attention in plaintiff's brief, is limited to the following colloquy:

"Q. Mrs. Ponticelli was an assembler, then she was cleaning filters?

"A. Correct.

"Q. She asked to be removed from that job didn't she?

"A. Yes, and I removed her.

"Q. Because she lost 22 lbs. in the filtering, didn't she? * * *

"THE COURT: Objection sustained. Motion to strike is granted.

"Q. Before she was removed from her job she went to see Mr. Crook the personnel manager isn't that correct"

* * * *

"A. She may have.

"Q. Did she or didn't she?

"A. I believe she did.

* * *

"Q. She did?

"A. I believe she did.

"Q. Mr. Crook is in a position of high authority, higher than you in the company?

"A. Yes, that is correct.

"Q. She went over your head to see Mr. Crook to ask for a change of jobs, isn't that correct?

* * *

"A. That is correct.

"Q. And her job was changed?

"A. Yes it was changed."

tablished fact that she was a remarkable producer whose dexterity in the performance of her assigned labors far surpassed that of her fellow employees and enabled her to earn a weekly pay almost equal to that which Demers himself received.

She now points to the two-year-old incident as well as to Demers' testimony covering her supposed deficiencies as providing the evidentiary basis upon which the jury might reasonably have concluded that the report of her "pushing the pencil" was maliciously actuated. We cannot agree. While a jury might, and possibly with reason, have inferred that Demers was resentful that she had gone over his head or that he bore her a grudge because her compensation as a laborer was almost the equal of his as a supervisor, that evidence without more does not reasonably yield to the conclusion that the primary motivation for Demers' report to her fellow-workers was his ill will or spite toward her.

The inferential possibilities considered in the light most favorable to the plaintiff are susceptible to no more than the conclusion that Demers may have derived an incidental gratification by reason of the disclosure of plaintiff's difficulties. That fortuitous satisfaction was not enough to get to the jury the question of whether the occasion for the privilege was abused.

The plaintiff's appeal in each case is denied and dismissed.

*Charles A. Hirsch,* for plaintiff.

*Francis V. Reynolds, Paul V. Reynolds,* for defendants.