Edward AVILLA Jr.

v.

**NEWPORT GRAND JAI ALAI LLC et al.**

No. 2006–299–Appeal.

Supreme Court of Rhode Island.

Nov. 21, 2007.

Robert M. Novack, Fall River, MA, for Plaintiff.

Jeremiah Lynch, III, Middletown, for Newport Grand, Defendant.

Jeanne M. Scott, Providence, for Ramon El Ordi, Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## O P I N I O N

Justice FLAHERTY, for the Court.

In the sport of jai alai, putting forth one's "[b]est efforts" is a cardinal rule for players.[1] Discerning when a player has put forth his best, or when he has not done so, is a highly subjective determination, and in the close-knit community of jai alai, careers may be damaged or destroyed on the basis of suspicions and opinions alone. In this case, brought by a discharged jai alai player, we are asked to determine (1) whether the Superior Court properly granted summary judgment in a defamation claim when a jai alai player's employer told the players' union why that player was not rehired, and (2) whether summary judgment was appropriate to determine the existence of improper influence with respect to the player's allegation of intentional interference with prospective contractual relations.

We affirm the judgment of the Superior Court.

### Factual Background

The plaintiff Edward Avilla (Avilla) was employed by defendant Newport Grand Jai Alai LLC (Newport Grand) as a professional jai alai player. Avilla worked at Newport Grand for eight consecutive seasons, and he was consistently one of the top athletes at the facility. However, at the end of 2001, Avilla received notice that Newport Grand would not rehire him for the next season. Disappointed, Avilla sought out Cathy Rayner (Rayner), who was also an employee at Newport Grand, and who served as a union representative. Although the players were covered by a collective bargaining agreement, the labor contract did not contain a grievance procedure for occasions when players were not rehired, and the players were considered at-will employees. Nonetheless, Rayner was known for inquiring on behalf of players and influencing management to rehire them, even after termination.

Rayner first spoke with the chief executive officer of Newport Grand, Diane Hurley (Hurley), and inquired why Avilla was not rehired. Hurley told Rayner that Avilla was not rehired because there were some inconsistencies with Avilla as a player. Rayner relayed this information to Riki Sotil (Sotil), the jai alai union president. At a meeting between Sotil and Hurley, Hurley told Sotil that Avilla was not rehired because he was suspected of fixing games by the players' manager Ramon Elordi (Elordi). Elordi's job duties included observing the players and ensuring that they put forth their "best efforts."[2] Sotil conducted an independent investigation, after which he asserted that the allegations against Avilla were false. Thereafter, Rayner and Sotil began advocating for plaintiff's reinstatement.

It is undisputed that their efforts initially were successful, and at the end of February 2002, Newport Grand decided to rehire plaintiff. However, when Elordi heard Avilla would be offered a position, he became extremely agitated and threatened to quit. As a result, plaintiff was not rehired. Rayner then proceeded to ask

---

1. Rules and Regulations of Jai Alai, 15.9.

2. Elordi also traveled abroad, scouting new talent before any existing players were rehired.

Elordi why Avilla was not rehired, to which Elordi responded, Avilla hit "too many balls on the wood."[3] According to Rayner's affidavit, within the close-knit jai alai community this expression "has one meaning that is that a player is cheating." However, Elordi never issued a warning to or fined plaintiff, nor did he notify the state gaming commission, because he said that he had no proof to substantiate his suspicions.

In February 2003, Avilla left Newport and tried to secure employment as a jai alai player in Florida. But, while warming up during a tryout, Thomas Myre, a jai alai player who had traveled to Florida with Avilla, was approached by the man in charge of the court. The man asked who Avilla was. Myre told the man, who then responded "Isn't that the guy who was fixing games in Newport Jai Alai?" Myre then told this to Avilla, who became so disgusted that he did not stay for the tryout. Avilla has since left the game of jai alai for good.

The plaintiff filed a complaint seeking damages against Newport Grand for defamation, based on the statements by Elordi and Hurley to Rayner and Sotil alleging that Avilla was cheating. The plaintiff's second count against Elordi for intentional interference with prospective contractual relations alleged that Elordi's threat to quit was an unjustified interference between Avilla and Newport Grand.

After the parties conducted discovery and the depositions of Avilla, Rayner, So-til, Elordi, and Hurley were taken, both defendants filed for summary judgment. Newport Grand argued that the statements were not defamatory and that they were privileged as a matter of law. Elordi claimed that Avilla had no cause of action for interference because he had no existing contract. In response, plaintiff filed a cross-motion for summary judgment on his claim against Elordi for intentional interference with prospective contractual relations.

A hearing justice granted Newport Grand's motion for summary judgment on the defamation count, finding that plaintiff did not meet his burden of proving the statements were defamatory and, further, that plaintiff did not overcome the applicable qualified privilege. Citing this Court's holding in *Mesolella v. City of Providence*, 508 A.2d 661 (R.I.1986), the hearing justice then ruled that plaintiff had an actionable tort claim for interference with prospective contractual relations, but that any interference by Elordi was justified and not improper as a matter of law. As a result, the hearing justice granted Elordi's motion for summary judgment on the count for intentional interference with prospective contractual relations and denied plaintiff's motion for summary judgment. The plaintiff timely appealed both grants of summary judgment for defendants and the denial of his own motion.[4]

---

3. Elordi testified at his deposition that he did not remember making this exact statement.

4. Ordinarily, a plaintiff's denial of summary judgment is not appealable as a matter of right, and review would be granted only by a petition for certiorari. However, this Court "regularly consider[s] appeals from the denial of a motion for summary judgment when coupled with an appeal or cross-appeal of the granting of a motion for summary judgment."

*O'Gara v. Ferrante*, 690 A.2d 1354, 1356 (R.I. 1997). In those situations, "the appeal is no longer interlocutory because the grant of summary judgment constituted a final and appealable judgment." *Id.* Therefore, we shall consider on appeal, plaintiff's denial of partial summary judgment together with his appeal of defendants' grants of summary judgment.

On appeal, plaintiff argues that (1) the statements made were defamatory as a matter of law, (2) the privilege does not apply to these facts, and (3) even if the privilege applies, the issue of whether malice overcame the qualified privilege was a question for the jury that was not properly resolved on summary judgment. Furthermore, plaintiff asks this Court to hold that as a matter of law Elordi's threat to quit his job resulted in Newport Grand's decision not to rehire Avilla and was an unjustified interference by Elordi in the relationship between Avilla and Newport Grand. Alternatively, Avilla argues that the issue of the propriety of Elordi's conduct created a jury question that was wrongly decided on summary judgment.

The defendants argue, irrespective of whether these statements are defamatory, that the statements between Newport Grand, its employees, and the union's representative and president are cloaked with a qualified privilege. They argue that plaintiff failed to offer any evidence of malice that could overcome this privilege. With respect to the interference count, Elordi argues that his threat to quit was a justified way of protecting his personal interest in maintaining the integrity of the players and the sport of jai alai.

### Standard of Review

■ "It is well settled that this Court reviews the granting of a summary judgment motion on a *de novo* basis." *M & B Realty, Inc. v. Duval*, 767 A.2d 60, 63 (R.I.2001) (citing *Marr Scaffolding Co. v. Fairground Forms, Inc.*, 682 A.2d 455, 457 (R.I.1996)). The same standards that apply to the trial justice govern our review. *Id.* (citing *Rotelli v. Catanzaro*, 686 A.2d 91, 93 (R.I.1996)). "The party opposing the motion for summary judgment 'carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions.'" *Taylor v. Mass. Flora Realty, Inc.*, 840 A.2d 1126, 1129 (R.I.2004) (quoting *United Lending Corp. v. City of Providence*, 827 A.2d 626, 631 (R.I.2003)). "[W]e will affirm a summary judgment if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Woodland Manor III Associates v. Keeney*, 713 A.2d 806, 810 (R.I.1998) (quoting *Rotelli*, 686 A.2d at 93).

### Analysis and Discussion

### Defamation

■ "To succeed in an action for defamation, the plaintiff must prove: (1) the utterance of a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence; and (4) damages." *Kevorkian v. Glass*, 913 A.2d 1043, 1047 (R.I.2007) (quoting *Mills v. C.H.I.L.D., Inc.*, 837 A.2d 714, 720 (R.I. 2003)). Because we affirm the clear applicability of privilege in this communication, we need not delve into the other elements, including whether the statements are defamatory as a matter of law.

■ "[T]he critical issues in this case are whether defendant enjoyed a qualified privilege * * * and if so, whether plaintiff pointed to anything tangible that would create a genuine issue regarding whether the privilege was abrogated by the conduct of the defendant." *Kevorkian*, 913 A.2d at 1048. The existence of a qualified privilege is a determination that turns on the facts of the case, but it is exclusively a question of law for the court to determine, not a jury. *DiBiasio v. Brown & Sharpe Manufacturing Co.*, 525 A.2d 489, 491 (R.I. 1987).

In *Ponticelli v. Mine Safety Appliance Co.*, 104 R.I. 549, 551, 247 A.2d 303, 305–06 (1968), this Court recognized that the defendants enjoyed a qualified privilege in which "the publication is such that the publisher acting in good faith correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third persons, or certain interests of the public." This Court also has held in determining the applicability of privilege that a " 'reciprocity of duty' must exist between the publisher of the statement and the recipient, such that the latter has an interest in receiving the information that corresponds to that of the publisher in communicating it." *Mills*, 837 A.2d at 720 (quoting *Ponticelli*, 104 R.I. at 551, 247 A.2d at 306).

In our opinion, this case is similar to *Kevorkian*, in which we held that an employer who sent a reference letter at the request of an ex-employee was protected by a qualified privilege with respect to the comments made in the letter. *Kevorkian*, 913 A.2d at 1048; *see also DiBiasio*, 525 A.2d at 492; *Swanson v. Speidel Corp.*, 110 R.I. 335, 339, 293 A.2d 307, 309 (1972). It is clear to us that everyone involved in the game of jai alai at Newport Grand had an interest in knowing why some players were rehired and others were not. *See Mills*, 837 A.2d at 720 (holding there was a qualified privilege where the defendants "shared a common interest in providing child-care for low income families and in ensuring that their clients met the requirements for continued participation in the day-care and head-start programs"). In fact, it was at plaintiff's initiative that Rayner inquired into why Avilla was not rehired the next season. Newport Grand had an interest in answering Rayner's questions truthfully and informing her of Avilla's shortcomings.

This privilege, however, is not absolute and otherwise privileged statements cannot be sustained if the defamatory statements have been induced by malice in the popular sense, such as personal spite or ill will. *Swanson*, 110 R.I. at 340, 293 A.2d at 310. We ordinarily have left the determination of the primary motivation of a defendant as a question of fact, not to be dealt with on summary judgment. *See id.* at 341, 293 A.2d at 310–11. However, once the privilege is established,

"[i]t then becomes the defamed person's obligation to prove express malice. * * * To support his burden he must show that the primary motivating force for the communication was the publisher's ill will or spite toward him. Where, however, the causative factor was the common interest, a publisher's resentment toward the person defamed is immaterial and any incidental gratification is without legal significance." *Swanson*, 110 R.I. at 341, 293 A.2d at 311 (quoting *Ponticelli*, 104 R.I. at 556, 247 A.2d at 308).

To meet his burden of demonstrating malice, plaintiff offers the evidence that Elordi threatened to quit if Avilla was rehired and a single incident in which Avilla was suspended for having an argument with Elordi's assistant. In our opinion, this simply is not sufficient. In *DiBiasio*, the inconsistent and contradictory testimony of the defendant employer created a question of malice for the jury, but here Avilla has not demonstrated any similar issue of a material fact with respect to malice that properly could be presented to a jury. *See DiBiasio*, 525 A.2d at 492. We hold that plaintiff failed to raise a genuine issue of material fact concerning possible malice on Elordi's part, and even viewing the evidence in the light most favorable to plaintiff, "the only reasonable conclusion that can be reached from the

facts alleged is the ill will or spite alleged were merely incidental rather than motivating." *Swanson*, 110 R.I. at 341, 293 A.2d at 311. We therefore affirm the hearing justice's grant of summary judgment on the defamation count of plaintiff's complaint.

## Intentional Interference with Prospective Contractual Relations

Avilla also contends that Elordi intentionally and unjustifiably sabotaged his employment relationship with Newport Grand. The Superior Court found that Elordi's actions were justified as a matter of law. The plaintiff appeals this judgment, arguing that whether Elordi's interference was justified should be left to the jury because whether Elordi used improper means or possessed improper motive is a dispute to be resolved by a fact-finder. In his cross-appeal, Avilla asks this Court to hold that by threatening to quit his position, Elordi used improper means to interfere with Avilla's expectation of continued employment. The plaintiff maintains that Elordi's passionate response that he would quit if Avilla was rehired, Avilla's brief suspension for arguing with Elordi's assistant a few months earlier, and Elordi's admissions that he did not give warnings or have any actual proof of cheating, are evidence that Elordi harbored legal malice.

At the heart of this claim is whether Elordi acted improperly and whether that determination is a question of fact for trial or a question of law properly decided on summary judgment. The parties concede that the facts with respect to Avilla's rehiring and subsequent termination are largely undisputed; however, plaintiff argues that Elordi's intent in preventing Avilla's rehire, the propriety of his motive, and the means he chose to prevent Avilla's rehire are all questions for a fact-finder after trial. We disagree for the reasons set forth below.

The tort of intentional interference with prospective contractual relations was first considered by this Court in *Federal Auto Body Works, Inc. v. Aetna Casualty & Surety Co.*, 447 A.2d 377 (R.I.1982) (*Federal Auto Body*).[5] In *Federal Auto Body*, the plaintiff auto repair shop appealed the dismissal of its case under Rule 41(b)(2) of the Superior Court Rules of Civil Procedure that was granted after the close of the plaintiff's evidence, in favor of the defendant insurance company. *Federal Auto Body*, 447 A.2d at 378. The repair shop sought an injunction against the insurer because its contracts with its insureds required the removal of damaged vehicles from the repair shop so that they could be inspected elsewhere, both before and after repair. *Id.* The plaintiff argued that this destroyed goodwill among its customers and interfered with its relationships with them. *Id.* We held that the evidence presented at the hearing supported the trial justice's conclusion that Aetna's actions were not improper. *Id.* at 380. This Court reasoned that Aetna had a clear financial interest in inspecting damaged vehicles to determine the value of the loss.[6]

---

5. The Court at that time stated: "Although this court has not yet recognized a right to recover for interference with a prospective contractual relation, it is well settled that such a right could exist only if the interference complained of is intentional and improper * * *." *Federal Auto Body Works, Inc. v. Aetna Cas. & Surety Co.*, 447 A.2d 377, 379–80 (R.I.1982).

6. "One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he (a) does not employ wrongful means and

*Id.* Therefore, we reasoned, requiring such inspection off the premises did not constitute a wrongful means to protect that interest. *Id.* at 380 n. 5 (citing Restatement (Second) *Torts* § 769 at 44 (1979)).

In *Federal Auto Body,* this Court quoted the rule according to the Restatement (Second) *Torts* § 766B at 20 (1979):

> "One who *intentionally and improperly* interferes with another's prospective contractual relation (except contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." *Federal Auto Body,* 447 A.2d at 380 n. 4 (emphasis added).

Later, in *Mesolella,* this Court said the elements of intentional interference with prospective contractual relations "are identical to those required to state a claim based on interference with contractual relations, except for the requirement in the latter that an actual contract exist." *Mesolella,* 508 A.2d at 670 (citing *Smith Development Corp. v. Bilow Enterprises, Inc.,* 112 R.I. 203, 211, 308 A.2d 477, 482 (1972)). We listed those elements as, "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." *L.A. Ray Realty v. Town Council of Cumberland,* 698 A.2d 202, 207 (R.I.1997) (quoting *Mesolella,* 508 A.2d at 669; *Roy v. Woonsocket Institution for Savings,* 525

A.2d 915 (R.I.1987)). In our opinion, the elements of the tort require showing an "intentional and improper" act of interference, not merely an intentional act of interference. Restatement (Second) *Torts* § 766B, cmt. d at 22 (1979); *see also Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293, 304 (Utah 1982) (discussing the history and elements of the tort and citing *Top Service Body Shop, Inc. v. Allstate Insurance Co.,* 283 Or. 201, 582 P.2d 1365 (1978)).

Viewed through this prism, we must determine whether there is any issue of material fact about whether Elordi engaged in an improper interference. In making this determination, we consider "(1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interest with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of the social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff; (6) the proximity of the actor's conduct to the interference complained of; and (7) the parties' relationship." *Belliveau Building Corp. v. O'Coin,* 763 A.2d 622, 628 n. 3 (R.I.2000) (citing Restatement (Second) *Torts* § 767 at 26–27 (1979)). Determining "improper" conduct " 'depends upon the judgment and choice of values in each situation,' " therefore, "the factors listed above are not exhaustive for making such a determination." *Id.*

▮ Unlike other intentional torts, tortious interference with contract (and prospective contractual relations) "has not developed a crystallized set of definite rules as to the existence or non-existence of privilege to act * * *." *Belliveau Building Corp.,* 763 A.2d at 628 (quoting Re-

---

(b) acts to protect his interest from being prejudiced by the relation." *Federal Auto*

*Body,* 447 A.2d at 380 n. 5 (quoting Restatement (Second) *Torts* § 769 at 44 (1979)).

statement (Second) *Torts* § 767 at 28 (1979)). We view the analysis of the Alabama Supreme Court, citing the Seventh Circuit with approval; that Court said, "We do not believe a searching analysis only of motive is in most instances enough to send these cases to the jury. There must still * * * be something 'illegal' about the means employed." *Tom's Foods v. Carn,* 896 So.2d 443, 458 (Ala.2004) (quoting *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 543 (7th Cir. 1986)). "Here the means used, no matter how viewed or how characterized, do not rise to the required level of wrongfulness." *Great Escape,* 791 F.2d at 543.

Here, all the factors weigh heavily in Elordi's favor. Elordi was Avilla's direct supervisor. Elordi was required to work intimately with the players; he played a large role in hiring and recruiting and he had some responsibility for the players' actions. Although there is no question that Elordi made a statement that purported to force Newport Grand to choose between rehiring Avilla and losing a manager, we believe that he had a right to be jobless rather than supervise Avilla and be held accountable for Avilla's performance. Similarly, we conclude that Newport Grand had a right to choose Elordi over Avilla.

This case is similar to *Roy,* 525 A.2d at 919, in which this Court affirmed a directed verdict for the defendant because the evidence did not support a finding that the plaintiff's supervisor tortiously interfered with his prospective contractual relations. In *Roy,* the management was considering implementing one of two data-processing systems. *Id.* at 916. The plaintiff advocated for one system and his immediate supervisor advocated for the other. *Id.* Eventually, management adopted the supervisor's preference. *Id.* However, the plaintiff continued to urge the retention of the old system, and he had a negative effect on the other employees, causing a "near mutinous condition." *Id.* As a result, and based upon the supervisor's recommendation, the plaintiff was fired. *Id.*

This Court held that there was no evidence that could lead to the conclusion that the supervisor acted with legal malice when he recommended the plaintiff's termination. *Roy,* 525 A.2d at 919. This Court noted that in ruling on a motion for directed verdict, the trial justice was required to examine all evidence in the light most favorable to the plaintiff; however, "the trial justice is also under the concomitant duty to grant the motion if the evidence is insufficient in law to support a verdict in the plaintiff's favor." *Id.* (quoting *Marshall v. Tomaselli,* 118 R.I. 190, 195, 372 A.2d 1280, 1283 (1977)). To support his argument, Avilla cites caselaw in other jurisdictions where courts have upheld jury findings in which the defendant doctors, who were not the direct supervisors of the plaintiffs in question, improperly interfered with the plaintiffs' relationships with their respective employers.[7] However, we find these cases unpersuasive with respect to the facts now before us.

In our opinion, under the narrow circumstances of this case, because Elordi was an employee of Newport Grand and Avilla's supervisor, Elordi's forcing his employer to choose between him and another employee was not improper as a matter of law, and no reasonable jury could find otherwise.

---

7. *See Taylor v. Pratt,* 135 Me. 282, 195 A. 205 (1937) (upholding jury verdict finding wrongful interference on the part of the defendant); *Owen v. Williams,* 322 Mass. 356, 77 N.E.2d 318 (1948) (upholding jury verdict in which the defendant did not prove to the jury that a privileged occasion existed for his interference).

### Conclusion

We affirm the judgment of the Superior Court and return the record in this case thereto.