# United States Court of Appeals
## For the First Circuit

No. 07-1879

CHRISTOPHER HAVLIK,

Plaintiff, Appellant,

v.

JOHNSON & WALES UNIVERSITY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya and Stahl, Senior Circuit Judges.

John R. Mahoney, with whom Asquith & Mahoney, LLP was on brief, for appellant.
Paul V. Curcio, with whom John A. Tarantino, Katy A. Hynes, and Adler Pollock & Sheehan P.C. were on brief, for appellee.

December 5, 2007

**SELYA**, **Senior Circuit Judge**. The Clery Act, 20 U.S.C. § 1092(f) (the Act), requires colleges and universities that participate in federal financial aid programs to notify their constituent communities of certain reported crimes. This case requires us to construe, for the first time at the federal appellate level, the Act's notification requirements. After analyzing the language and purpose of the Act, charting the dimensions of the plaintiff's claims, and sifting through the factual record, we affirm the district court's entry of summary judgment in favor of the defendant university.

## I. BACKGROUND

The plaintiff, Christopher Havlik, is a citizen and resident of New York. In 2002, he enrolled as an undergraduate at Johnson & Wales University (the University) in Providence, Rhode Island. The events that led to this litigation occurred early in his junior year.

In the late night or wee morning hours of September 16-17, 2004, the plaintiff engaged in a heated exchange with another student, Donald Ratcliffe, on a sidewalk near the intersection of Richmond and Pine Streets in Providence. In the course of this encounter, the plaintiff punched Ratcliffe, knocking him to the ground. As a result, Ratcliffe hit his head on the sidewalk.

The Providence police responded and investigated the incident. Acquaintances of each protagonist had witnessed the

fracas and gave somewhat differing accounts of what had transpired. One witness told the police that the plaintiff was holding a knife at the time of the confrontation.

The police arranged for Ratcliffe to be taken by ambulance to a local hospital, where he was found to have sustained a concussion and a fractured skull. Then, after concluding their probe, the police lodged a criminal charge against the plaintiff.

The incident was duly reported to the University's campus safety and security office. That office commenced its own inquiry. This inquiry culminated in an incident report, which indicated that the episode probably had been triggered by fraternity-related animosities; that the plaintiff was the likely aggressor; and that he reputedly flashed a knife at the time. At least one witness stated that he and a friend (also a witness) feared that the plaintiff or his fraternity brothers would retaliate against them for cooperating in the investigation.

On September 20, the University's student conduct office notified the plaintiff of his temporary suspension for violating rules contained in the student code of conduct (the Code). The notice cited three violations: assaulting another student, possessing a knife, and engaging in criminal behavior. The notice advised the plaintiff that he had a right to a hearing and scheduled one for the following day.

The hearing went forward the next morning before the student conduct board (the Board). The plaintiff explained his actions and presented witnesses who testified on his behalf. Other evidence also was adduced. After mulling all the proof, the Board found the plaintiff "responsible" for assaulting another student and for engaging in lawless behavior (the first and third charges). It found him "not responsible" for possessing a knife (the second charge). The Board then recommended that the plaintiff be dismissed from the University for having transgressed the Code and notified him of his right to appeal its decision.

During the course of these proceedings, other (related) events were occurring on a parallel track. On the same day that the plaintiff received notice of his suspension, the University's chief in-house counsel, Barbara Bennett, reviewed and revised a draft of a "crime alert" that she had received that day from the campus safety and security office. The crime alert was, in effect, a notice designed to inform the University community of a reported crime.

While both versions of the crime alert included statements that a blow had been struck and a knife had been brandished, Bennett's version contained two facts not included in the original draft. First, it noted that members of a particular fraternity (ZBT), whose enrollment included the plaintiff, were

-4-

involved in the incident. Second, it named the plaintiff as the party reportedly responsible for the crime.

When her work was finished, Bennett sent the final version of the crime alert back to the campus safety and security office. Personnel from that office posted it in various locations some time after 4:00 pm on September 21. The record indicates that, at the relevant times, neither Bennett nor the campus safety and security office had any knowledge of the outcome of the disciplinary hearing before the Board.

The plaintiff decided to appeal the Board's decision, as was his right. Prior to going forward with his appeal, he and his mother conferred with Ronald Martel, the University's vice-president for student affairs. At the meeting, Martel accused the plaintiff of dissembling about the incident and called his fraternity brothers "thugs." The plaintiff nonetheless persisted in his appeal and Martel (to whom the letter of appeal was sent) turned the matter over to the designated appeal officer, Veera Sarawgi (also a vice-president of the University).

Although Sarawgi was not deposed, she would in the normal course of events have received, along with the letter of appeal, the hearing notification, a statement of applicable hearing procedures, the Board's decision, and the University's incident

report.[1]  Sarawgi also asked Martel whether he knew of any reason that the Board's proposed sanction should be tempered or overturned.  Martel replied in the negative.  Nothing in the record indicates that he shared his views about either ZBT or the plaintiff's veracity with Sarawgi.  On September 29, Sarawgi affirmed the plaintiff's dismissal.

During and after this time frame, a criminal prosecution was being mounted.  The Providence police had charged the plaintiff with criminal assault.  See R.I. Gen. Laws § 11-5-3.  The case originally was heard in the state district court and the plaintiff was found guilty after a bench trial.  He appealed to the superior court and claimed his right to a de novo jury trial.  See id. § 12-17-1.  In May of 2005, a jury acquitted him.

Disgruntled by the disruption of his scholarly pursuits, the plaintiff filed a civil action against the University in Rhode Island's federal district court.  He premised jurisdiction on diversity of citizenship and the existence of a controversy in the requisite amount.  See 28 U.S.C. § 1332(a).  His complaint alleged defamatory publication of false information by means of the crime alert and breach of contract for the University's failure to provide a fair appeal process.  The University denied the material

---

[1]In his deposition, Martel listed these materials as the standard contents of the file given an appeal officer.  At any rate, no issue is raised in this appeal as to the nature of the documents transmitted to Sarawgi.

allegations of the complaint and, after the close of discovery, moved for summary judgment. The district court granted the motion. Havlik v. Johnson & Wales Univ., 490 F. Supp. 2d 250, 262 (D.R.I. 2007). This timely appeal followed.

## II. ANALYSIS

We review a district court's entry of summary judgment de novo. Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006). In conducting that tamisage, we must sift the evidence and evaluate it in the light most congenial to the nonmovant (here, the plaintiff). Id. By the same token, we draw all reasonable inferences from the facts in the nonmovant's favor. Id. We caution, however, that this decisional calculus need not take into account "bald assertions, unsupported conclusions, or optimistic surmises." Bennett v. Saint-Gobain Corp., ___ F.3d ___, ___ (1st Cir. 2007) [2007 WL 3227393, at *5]. When all is said and done, we will affirm the summary judgment order only if the record, scrutinized in the foregoing manner, reveals no genuine issue of material fact and verifies that the movant (here, the University) is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

### A. The Clery Act.

To put the relevance of the Clery Act into perspective, we deem it useful to begin by delineating the anatomy of the plaintiff's defamation claim. Defamation is a common law cause of

-7-

action that arises under state law (here, the law of Rhode Island — the place of publication).

In Rhode Island, defamation requires proof that (i) the defendant made a false and defamatory statement regarding another, (ii) published it to a third party without an attendant privilege and (iii) was at least negligent in making the publication, with the result that (iv) the defamed party incurred harm. Kevorkian v. Glass, 913 A.2d 1043, 1047 (R.I. 2007). Consistent with this formulation, the defendant may avoid liability by showing that the publication enjoys a qualified privilege. See Mills v. C.H.I.L.D., Inc., 837 A.2d 714, 720 (R.I. 2003).

In this instance, the district court assumed for argument's sake that the crime alert was defamatory. Havlik, 490 F. Supp. 2d at 255. It determined, however, that the University enjoyed a qualified privilege, stemming from its duty under the Act, to publish the crime alert. Id. at 258. The court further determined that, in issuing the crime alert, the University acted without ill will or malice, so that the qualified privilege protected it from liability. Id. at 260.

The plaintiff advances three primary claims of error with respect to this multi-part determination. In addressing them sequentially, we assume arguendo, as did the district court, that the crime alert contained defamatory statements.

-8-

**1.  The Qualified Privilege**.  Under Rhode Island law, a qualified privilege attaches if "the publisher acting in good faith correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third persons, or certain interests of the public."  Ponticelli v. Mine Safety Appl. Co., 247 A.2d 303, 305-06 (R.I. 1968).  Thus, the privilege may apply when the speaker's perception of his duty to speak, though incorrect, is nonetheless reasonable.  See id.

With this legal landscape in mind, the plaintiff argues that the University had no duty under the Act to report his involvement in the putative crime to the campus community and that, therefore, it had no qualified privilege to publish the crime alert.  The University demurs, insisting that it had a legal duty to report the putative crime and set out the known particulars.  On that basis, it defends the district court's holding that a qualified privilege obtained.

To determine whether the University enjoyed a qualified privilege, we must first determine whether its professed belief in its legal duty was reasonable.  This brings us to the Clery Act,[2]

---

[2]In its original incarnation, the Act was given the short title "Crime Awareness and Campus Security Act of 1990."  Congress amended the Act in 1998 and renamed it the "Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act."  Most commentators now use the shorthand "the Clery Act," and so do we.

so a brief exposition of the Act's provisions and legislative purpose is in order.

The Clery Act mandates that all colleges and universities that accept federal funding must notify the constituent campus communities — students, faculty, employees, and the like — when certain crimes are brought to their attention. Specifically, the Act requires every covered entity to make "timely reports to the campus community on [certain] crimes considered to be a threat to other students and employees . . . that are reported to campus security or local law police agencies." 20 U.S.C. § 1092(f)(3).

The Act has both qualitative and situational limitations. As to the former, the Act does not reach all types of crimes but only encompasses murder, manslaughter, aggravated assault, sex offenses, robbery, burglary, motor vehicle theft, arson, liquor, drug, and weapons offenses, and hate crimes. Id. § 1092 (f)(1)(F)(i)-(ii). An aggravated assault is a covered crime, and in this venue the plaintiff does not contest that his confrontation with Ratcliffe qualifies under that rubric. See Appellant's Br. at 14-15.

Paragraph (1)(F) of the Act contains the relevant situational limitations. It describes the loci of crimes that must be reported. See 20 U.S.C. § 1092(f)(1)(F). That paragraph speaks of crimes that occur "on campus, in or on noncampus buildings or property, and on public property . . . ." Id. The Act then

-10-

proceeds to define each of these terms. "[N]oncampus building[s] or property" are those owned or controlled by the institution that are outside the "reasonably contiguous geographic area of the institution," id. § 1092(f)(6)(A)(ii); "public property" is non-owned property within the area reasonably contiguous to the institution and adjacent to a facility owned or controlled by the institution, id. § 1092(f)(6)(A)(iii).

The goal of the notification requirement is to protect members of the constituent campus communities by "aid[ing] in the prevention of similar occurrences." Id. § 1092(f)(3). The Act's history illuminates the centrality of this goal. Congress passed the original version of the Act in 1990 amid concerns that the proliferation of campus crime created a growing threat to students, faculty, and school employees. See H.R. Rep. No. 101-518, at 7 (1990), reprinted in 1990 U.S.C.C.A.N. 3363, 3369. Congress recognized that contemporary campus communities had become increasingly dangerous places. Id. Furthermore, it noted that, in roughly eighty percent of crimes on campus, both the perpetrator and the victim were students. See Crime Awareness and Campus Security Act of 1990, Pub. L. No. 101-542, § 202, 104 Stat. 2381, 2384 (codified as amended at 20 U.S.C. § 1092(f)).

Notwithstanding these concerns, the first iteration of the Act restricted the reporting requirement to crimes committed on campus. See 20 U.S.C. §§ 1092(f)(1)(F) & (f)(3) (1990); see also

-11-

H.R. Rep. No. 101-518, at 8, reprinted in 1990 U.S.C.C.A.N. at 3371 (disclaiming any intention "that institutions report . . . offenses which occur outside of the campus"). Over time, however, Congress became dissatisfied with this restriction. In 1996, the House of Representatives expressed its displeasure with current enforcement efforts and passed a resolution calling for the Department of Education to make "[s]afety of students . . . the number one priority." H.R. Rep. No. 104-875 (1997), reprinted in 1997 WL 10633, at *61 (citing H.R. Res. 470, 104th Cong. (1996)).

Two years later, Congress amended the Act to provide broader protections. Through the Higher Education Amendments of 1998, Congress expanded the Act's coverage to reach not only crimes committed on campus but also crimes committed on "noncampus" and "public" property, so long as (i) the property on which a crime occurs is owned or controlled by, or adjacent to a facility owned or controlled by, the institution, and (ii) that property or facility is used by the institution in direct support of, or in a way related to, its educational mission. Higher Education Amendments of 1998, Pub. L. No. 105-244, 112 Stat. 1581, 1744 (codified as amended at 20 U.S.C. § 1092(f)(6)(A)).

From the start, Congress made manifest a desire that educational institutions retain the ability to tailor security procedures to particularized needs. See, e.g., H.R. Rep. No. 101-518, at 9, reprinted in 1990 U.S.C.C.A.N. at 3371 (stating that the

-12-

legislation was designed "to encourage campuses to develop campus security policies and procedures which are appropriate to the unique conditions of [each particular] campus"). The 1998 amendments did not retreat from this aspiration. See, e.g., 20 U.S.C. § 1092(f)(2) (declining "to authorize the Secretary [of Education] to require particular policies, procedures, or practices by institutions of higher education with respect to campus crimes or campus security"). As we read the Act, it vests substantial discretion in each campus security office to phrase and disseminate reports in those ways that the particular institution deems best suited to apprise its constituent campus communities of incipient criminal activity.

In this case, the district court determined that the locus of the incident fell under the Act's definition of "public property." Havlik, 490 F. Supp. 2d at 257; see 20 U.S.C. § 1092(f)(6)(A)(iii) (defining "public property" as "all property that is within the same reasonably contiguous geographic area of the institution, such as a sidewalk . . . and is adjacent to a facility owned or controlled by the institution" so long as "the facility is used by the institution in direct support of, or in a manner related to the institution's educational purposes"). On appeal, the plaintiff remonstrates that the University was not careful enough in gauging the location of the incident. Building on this foundation, he engages in an exegetic discourse about the

meaning of terms such as "campus," "noncampus," and "public property," culminating in an assertion that the locus of the incident falls outside the compass of those definitions (and, thus, outside the compass of the Act).

We do not doubt the importance of the meaning that Congress assigned to each of these terms. Nevertheless, we reject the notion that the coverage of the Act turns exclusively on the use of a surveyor's theodolite. Reasonableness is the beacon by which institutions must steer, and reasonableness is not totally constrained by mathematically precise metes and bounds. So, too, common sense must inform a court's assessment of the reasonableness of a university's belief that the reporting of a crime is compulsory under the Act. And in making that assessment, the need to assure safety and security for campus communities counsels that doubts should be resolved in favor of notification.

In the case at hand, Bennett — the official who authored the final version of this crime alert — testified without contradiction that when advising school hierarchs whether a duty to publish a timely notification exists, she first determines whether the crime is of a type covered by the Act; she then determines whether it has been reported to campus security or local law enforcement; and she then determines whether the underlying conduct signals a threat to the University community (a determination that

takes into account where the incident happened).  She believed that all of these factors supported notification in this instance.

Nothing in the record undermines the reasonableness of Bennett's professed belief that the University had a responsibility under the Act to issue a timely notification about the incident. There is absolutely no evidence that the University thought that the incident had occurred outside the geographic purview of the Act.  Moreover, while Bennett stated that she was not concerned with the specific street address at which the brouhaha erupted, she did consider the location of the crime to the extent of satisfying herself that it had taken place "in the vicinity of [the] campus and [in] an area that [the University's] students were known to frequent."

No more was exigible: school officials must act expeditiously to satisfy their responsibilities under the Clery Act, and a reasonable belief — even if later shown to be incorrect in some particular — is all that is required for the qualified privilege to attach.

That ends this phase of our inquiry.  Because Bennett's belief that the University had a duty to report the crime was

reasonable,[3] that belief sufficed to place publication of the crime within the ambit of the qualified privilege conferred by the Act.

**2. <u>The University's Primary Motive</u>**. The plaintiff next argues that even if the Act applies, the district court erred in upholding the qualified privilege because he adduced sufficient evidence to make out a genuine issue of material fact as to whether that privilege was vitiated. Once again, we begin with a brief overview of the background legal rules.

A qualified privilege is not a jujube that, like some magical charm, wards off liability for defamation, come what may. In Rhode Island, as elsewhere, such a privilege may be abrogated if the plaintiff proves that the privilege-holder published the offending statement out of spite, ill will, or malice. <u>See</u> <u>Kevorkian</u>, 913 A.2d at 1048; <u>Mills</u>, 837 A.2d at 720. To carry this burden, the plaintiff must show that malice — we use that word as a generic shorthand that includes ill will and spite — comprised

---

[3]In all events, Bennett's belief was quite probably correct. The plaintiff argues that the sidewalk where the fracas occurred did not constitute "public property" within the purview of the Act because it is adjacent to a parking lot owned by a third party. This argument overlooks, however, that the University presented uncontradicted evidence showing that this parking lot was owned by one of its subsidiary corporations, that it (the University) maintained the parking lot, and that the lot was used, at least in part, for employee and student parking and similar activities related to the University's educational mission. Because the only plausible conclusion that can be drawn from this undisputed evidence is that the University controlled the parking lot, the sidewalk adjacent to it was public property within the purview of the Act. <u>See</u> 20 U.S.C. § 1092(f)(6)(A)(iii).

-16-

the defendant's primary motive in publishing the statement. Mills, 837 A.2d at 720. To accomplish this goal, the plaintiff cannot rest on naked assertions or bare conclusions but, rather, must proffer facts sufficient to support a finding of malice as a primary motive. See Kevorkian, 913 A.2d at 1049 (explaining that "to overcome a motion for summary judgment based on a qualified privilege, a plaintiff must point to some specific facts in the record that raise a genuine issue" as to the existence of malice).

Here, the plaintiff argues that summary judgment was improvident because the University's use of his name and fraternity affiliation in the crime alert and Martel's negative statements about him and his fraternity were sufficient to support an inference of malice. He adds that the statement in the crime alert about his possession of a knife buttresses this inference, given the Board's finding, hours before the crime alert issued, that he was "not responsible" on the knife-wielding charge. We do not agree.

At the outset, it is important to note that every university is different, and each one has its own culture. Mindful of this diversity, the Act stipulates no hard-and-fast rules but, instead, gives institutions of higher learning substantial leeway to decide how notices should be phrased and disseminated so as most effectively to prevent future incidents. See, e.g., 20 U.S.C. § 1092(f)(3) (directing colleges and universities to make timely

reports "in a manner . . . that will aid in the prevention of similar occurrences" (emphasis supplied)); see also H.R. Rep. No. 101-518, at 8, reprinted in 1990 U.S.C.C.A.N. at 3371 (explaining that reports should be constructed to permit students "to better protect themselves"). Given this mise-en-scène, the plaintiff has proffered nothing that might suffice to show malice in the composition of the crime alert.

The record shows that Bennett, who made the decision to include the plaintiff's name and fraternity affiliation in the text of the crime alert, believed that the information would be useful to the campus community and would assist in preventing future incidents. Bennett testified that she thought the plaintiff represented a threat to others on campus both because his fraternity had been involved in past misbehavior — she knew of at least one previously reported incident — and because the campus safety and security office had been told that witnesses feared retaliation at the hands of ZBT. On this record, Bennett's belief, whether or not unarguably correct, was clearly reasonable and, thus, inspires no inference of malice.

In pursuing this line of attack, the plaintiff makes much of Martel's deposition testimony that, during his two-year tenure, there were approximately five other crime alerts that involved students allegedly responsible for crimes that did not name the alleged perpetrator. In her deposition, however, Bennett explained

that in all but one of those cases the student's identity was not known until after publication of the crime alert. On at least one other occasion, a student perpetrator's name was mentioned in a crime alert. She further explained that, in this instance, she chose to use the plaintiff's name because "we knew his identity."

That explanation seems sufficient, especially in view of three related facts. First, the crime alert as a whole appears consistent with the general tenor of the incident report and the police report. Second, there is no hint that Bennett even knew the plaintiff, let alone that she harbored any animus toward him. Last — but surely not least — the crime alert appears reasonably calculated to help prevent similar incidents. A finding of malice would, therefore, be totally at odds with the record.

To be sure, Martel — who accused the plaintiff of prevarication and called his fraternity brothers "thugs" — arguably may have harbored some hostility toward the plaintiff. The plaintiff insists that this ill will should be imputed to the University. But Martel's statements were made <u>after</u> the publication of the crime alert, and there is simply no evidence that Martel played any part in the preparation of that document. The motives of an employee who has no connection to a publication decision cannot be imputed to the institution for which he works and, thus, cannot defenestrate the institution's qualified privilege. <u>See</u> <u>Boston Mut. Life Ins. Co.</u> v. <u>Varone</u>, 303 F.2d 155,

159 (1st Cir. 1962) (stating that ill will of a nondecisionmaker is "immaterial" to privilege).

This leaves the fact that the Board found the plaintiff not responsible for possessing a knife a few hours before the University posted the crime alert. As to this item, there is a gap in the plaintiff's proof: the absence of any evidence that the University officials responsible for the publication were aware of the Board's finding at the time of publication. Bennett testified that she had no such knowledge until after publication had occurred, and there is no indication in the record that the campus safety and security office was any better informed. Finally, there is nothing to show that the University willfully blinded itself to the Board's finding. We conclude, therefore, that the inclusion of the "knife" language in the crime alert cannot support an inference of malice.[4]

**3. Punitive Damages**. The plaintiff's third assignment of error — that the district court blundered in squelching his quest for punitive damages — need not detain us. In this case, punitive damages are not a separate cause of action but, rather, an element of damages in, and thus wholly derivative of, the

---

[4]If more were needed — and we doubt that it is — the statement contained in the crime alert was literally true: that a witness had reported seeing a knife in the plaintiff's hand. It is hard to see how simply repeating what is stated in a police report about a reportable crime, as was done here, could fall outside the privilege created by the Act.

plaintiff's defamation claim. Cf. Chrabaszcz v. Johnston Sch. Comm., 474 F. Supp. 2d 298, 311 (D.R.I. 2007) (recognizing need for proof of causal link between defamatory statements and damages under Rhode Island law). Because the district court appropriately terminated that claim at the summary judgment stage, see supra Parts II (A)(1)-(2), the plaintiff has no conceivable basis for an award of punitive damages.

### B. **The Contract**.

A student's relationship to his university is based in contract. Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998). The plaintiff's final claim of error in this case is that the lower court erred in granting summary judgment in favor of the University on his breach of contract claim.

The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook. See, e.g., id. We interpret such contractual terms in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them. See id. Thus, if the university explicitly promises an appeal process in disciplinary matters, that process must be carried out in line with the student's reasonable expectations. See Cloud v. Trs. of Boston Univ., 720 F.2d 721, 724-25 (1st Cir. 1983).

-21-

In this instance, the contract between the plaintiff and the University is governed by Rhode Island law. See Mangla, 135 F.3d at 83. That body of jurisprudence requires, among other things, that parties to a contract act pursuant to an implied duty of good faith and fair dealing. See id. at 84; Dovenmuehle Mortg., Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002). Good faith and fair dealing cannot be separated from context, however — and in evaluating those covenants in the educational milieu, courts must accord a school some measure of deference in matters of discipline. See Schaer v. Brandeis Univ., 735 N.E.2d 373, 381 (Mass. 2000) (stating that universities must be given broad discretion in disciplining students); see also Gorman v. St. Raphael Acad., 853 A.2d 28, 34 (R.I. 2004) (affording broad discretion to private schools to interpret contracts with students in ways that further the school's legitimate "educational and doctrinal responsibilities"); cf. Wood v. Strickland, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decisions of [public] school administrators which the court may view as lacking a basis in wisdom or compassion.").

The University prepares and distributes to those who enroll a student handbook. With respect to matters of student conduct, the handbook designates the rudimentary contractual terms between the parties vis-à-vis the appeal process. In pertinent part, it gives a student a right of appeal from the Board's

-22-

decision anent charges of violating the Code. It specifies the bases on which a student may appeal, including the imposition of an inappropriate sanction.

Once the student submits a letter stating the basis for his appeal, the appeal officer must engage in a "further review of the [Board's] decision." The handbook does not limn the procedures to be followed by the appeal officer, nor does it pair particular types of code violations with particular sanctions. It is likewise silent as to the kinds of materials that an appeal officer may review.

To the extent the handbook's terms are explicit, it is plain that the University complied with them. The plaintiff asseverates, however, that the University breached its implied duty of good faith and fair dealing because the appeal officer (Sarawgi) was improperly influenced by the phraseology of the crime alert and her conversation with Martel.

Given the sketchy nature of the appeal provision in the handbook and the straightforward nature of the materials that were made available to Sarawgi, see supra at 5, it seems entirely reasonable for her to have considered that information.[5] Cf. Schaer, 735 N.E.2d at 380 (holding that plaintiff had no reasonable

_____

[5]The record is opaque as to whether Sarawgi was given the crime alert. This is of no consequence. If she was, considering it would have been acceptable; if she was not, there is no ground for any complaint.

-23-

expectation for judicial proceedings where "nothing in the contract suggests that disciplinary proceedings will be conducted as though they were judicial proceedings"). Her consultation with Martel also seems within the realm of reasonableness. Martel, after all, was the University's vice-president for student affairs.

In any event, the plaintiff's assertions of improper influence fail in light of the uncontested facts. The plaintiff presented no evidence that Martel repeated his negative sentiments to Sarawgi. See Bennett, ___ F.3d at ___ [2007 WL 3227393, at *7] ("[C]onjecture cannot take the place of proof in the summary judgment calculus.").

To say more on this point would be to paint the lily. In the absence of any probative evidence that the appeal officer ignored promised protections, improperly consulted certain proof, acted arbitrarily in carrying out the procedures limned in the handbook, or made her decision in bad faith, there has been no showing that the plaintiff's reasonable expectations were thwarted. It follows that the University was entitled to summary judgment on the breach of contract claim.

## III. CONCLUSION

We need go no further. This matter was ably handled in the district court and for the reasons elucidated above, we uphold that court's summary judgment order.

**Affirmed**.

-24-