The plaintiffs, Timothy and Carolyn Hargrove, individually and in their representative capacities as the parents and next friends of their daughter, Sharda Lee Hargrove, appeal from a summary judgment for the defendant, Tree of Life Christian Day Care Center ("the Center"),[1] in this action seeking damages for breach of contract and under various tort theories. We affirm in part, reverse in part, and remand.
The evidence, viewed most favorably toward the Hargroves, as it must be under our standard for reviewing summary judgments,Woodruff v. Leighton Avenue Office Plaza, Ltd., 622 So.2d 304
(Ala. 1993), indicates the following: The Hargroves contracted with the Center for the daily care and supervision of their one-month-old daughter, Sharda. The Center, a church-affiliated child care provider, was licensed at that time by the Alabama Department of Human Resources ("DHR") to care for children 18 months old and older. (The Center's license has since been revoked.)[2] The Center's administrator, Bernice Mahan, provided the Hargroves with a rather lengthy document entitled "Operating Policies." That document, which stated that parents and guardians were expected "to read and follow the operating procedures," set out specific rules and procedures to be followed by the Center and the parents or guardians of the children. It provided, among other things, as follows:
 "The [Center] provides a healthy, safe, and Christian environment that promotes the physical, social, emotional, cognitive and spiritual development of young children, and seeks to respond to the needs of families.
 "All staff members are selected on the basis of experience in working with young children, educational background, emotional stability, as well as care and concern for the well-being of the child. All participate in a continuous program of in-service education and studies for professional advancement in order to remain alert to the ever-changing needs of today's children and families, and to the findings of current research.
". . . .
 "Children will be released only to properly identified persons who have been listed in the 'child release' section of the Parent-Agreement Form. We must have written authorization for changes in this respect. In unusual circumstances, we will accept verbal (phone) authorization to release a child to an individual not listed in writing. It must be followed up in writing if the child is to be released to that person on an ongoing basis. We will ask for identification of individuals we do not know. It would be helpful if you would arrange for the persons to pick up your child to visit the school with you so that the staff may become acquainted with them. We will not release a child in the care of anyone under the age of 14 years."
(Emphasis in original.)
In addition to a number of adults, the Center also employed 14-year-old J.B. and *Page 1244 
her sister, 17-year-old A. B., to assist in the care of the children.[3] J.B. and A.B. were two of five foster children in Mahan's custody. Mahan had become the girls' foster mother only a few months before the incident made the basis of this action. The Center also allowed another sister, 12-year-old V. B., to assist with the children from time to time, although she was apparently not paid. V.B. was not one of Mahan's foster children. On April 25, 1995, when the Hargroves' daughter was approximately three months old and while she was under the Center's care and supervision, the three sisters kidnapped her.
At the time of the kidnapping, there was no qualified adult teacher, other than perhaps Mahan, directly supervising the sisters. Mahan testified in her deposition that the other teacher or teachers had gone for the day and that she thought A.B. had intentionally distracted her while J.B. and V.B. slipped the Hargroves' daughter out the front door undetected. There was evidence suggesting that J.B. and A.B. had been physically abused (perhaps sexually) by certain members of their family and that A.B. had deceived DHR and Mahan into believing that she was pregnant; however, there was no evidence that could have placed Mahan or the Center on notice that the two girls had criminal propensities.
The local police and the Federal Bureau of Investigation investigated the incident and, based at least in part on false information provided by J. B., focused part of their investigation on the Hargroves. After approximately six days, Sharda Lee Hargrove was found and was reunited with her parents. The evidence suggests that the sisters had called the baby girl Jasmine instead of Sharda and that, other than indications of withdrawal and confusion, she suffered only from rashes in her mouth and on her bottom. The evidence also indicated, as one would expect, that this incident was a traumatic one and that it was very stressful on the Hargroves.
The Hargroves filed an eight-count complaint against the Center. Count one, filed in the Hargroves' individual and representative capacities, sought damages based on allegations that the Center, "through . . . negligent hiring and supervisory policies, practices, and/or procedures, proximately caused or allowed plaintiffs' minor child to be kidnapped while she was in the care and custody of the [Center]"; count two, filed in the Hargroves' individual and representative capacities, sought damages based on allegations that the Center, "through . . . wanton hiring and supervisory policies, practices or procedures . . . proximately caused or allowed the plaintiffs' minor child to be kidnapped while she was in the care and custody of the [Center]"; count three, filed by the Hargroves individually, sought damages based on allegations of breach of contract; count four, filed in the Hargroves' representative capacities, sought damages based on allegations that "due to the special relationships and other special circumstances involved herein, that is, the foster parent-child relationship between [Mahan] and J.B., and the relationship of Sharda, an innocent child in the [Center's] charge, the [Center] had a duty to protect Sharda from the criminal acts of J.B. and third parties, which such acts include but are not necessarily limited to kidnapping, offensive trespass to the person, and theft of personal property"; count five, filed by the Hargroves individually, sought damages based on allegations that the Center's "negligent and/or wanton breach of its duty to protect Sharda from the criminal acts of J.B. and third parties as averred in [count four] amounted to an intentional infliction of emotional distress and outrageous conduct [the tort of outrage], and that the [Center] is liable to the plaintiffs for their injuries and damages as a proximate result thereof due to the special relationships involved as set out in [count four]"; count six, filed in the Hargroves' representative capacities, sought damages based on allegations that the Center had negligently or wantonly invaded their daughter's privacy; count seven, filed by the Hargroves individually, sought damages based on allegations that the Center *Page 1245 
had negligently or wantonly invaded their privacy; and count eight, filed by the Hargroves in both their representative and individual capacities, sought damages under the doctrine of respondeat superior, based on allegations that J.B. had acted within the line and scope of her duties at the Center when she participated in the kidnapping. Count eight stated, in part, as follows:
 "The plaintiffs aver that the [Center] is liable to the plaintiffs for the intentional criminal acts done by its employee and/or agent, [J. B.], due to the special relationships involved herein as averred in [count four]. Such liability inures both from the theory of respondeat superior in that [J.B.] was an agent committing such intentional criminal acts and from the theory of common law premises liability even if such agency did not exist."
The trial court entered a summary judgment for the Center on all claims. The Hargroves appealed.
After carefully reviewing the record and the briefs, we conclude that, with the exception of count three (breach of contract) the summary judgment was proper with respect to each of the counts contained in the Hargroves' complaint. It is well settled that, absent special relationships or circumstances, no person or entity has a duty to protect another from the criminal act of a third person. A defendant cannot be held liable for the criminal act of a third party unless the defendant knew or had reason to know that the criminal act was about to occur on the defendant's premises. Young v. HuntsvilleHospital, 595 So.2d 1386 (Ala. 1992); Henley v. Pizitz RealtyCo., 456 So.2d 272 (Ala. 1984). This rule was applied in the day care context in N.J. v. Greater Emanuel Temple Holiness Church,611 So.2d 1036 (Ala. 1992). In that case, N.J., a minor child acting through her mother, as next friend, sued the church, alleging that the church had failed to use due care in watching and supervising N.J. in its day care program, and that it had thereby allowed N.J. to be raped on the church's premises by a second cousin of N.J. The cousin, J. R., lived with his family on the third floor of the church building and was a frequent visitor at N.J.'s house. The trial court entered a summary judgment for the church. This Court affirmed, holding that there was insufficient evidence of negligent supervision on the church's part. This Court, reiterating its reluctance to impose liability on one person or entity for the criminal act of another, specifically rejected the plaintiff's attempt to hold the church liable under the negligent supervision claim, based on the alleged criminal act of J. R.:
 "The affidavits of the director of the kindergarten and the pastor of the church indicate that (1) they had no knowledge of other criminal acts of a similar nature that might have occurred on the church's premises; and (2) they had no knowledge of any previous criminal behavior by J.R. Thus, the church made a prima facie showing that it was not responsible for the rape alleged by N.J.
 "Because N.J. failed to rebut that showing by substantial evidence of negligent supervision, the summary judgment in favor of the church was proper."
611 So.2d at 1038. Implied in the holding of that case is that there were no special circumstances or special relationships that would give rise to a duty on the church's part to take additional steps to protect N.J. This present case is materially indistinguishable from N.J.
Recently, in Copeland v. Samford University, 686 So.2d 190
(Ala. 1996), this Court held that, as a matter of law, Samford University was not liable for the murder of one of its students, Rex Copeland, by William Slagle, a former professor at Samford. The complaint in that case alleged that Samford had negligently hired and supervised Slagle and that Samford was liable under the doctrine of respondeat superior for the murder of Rex Copeland. With respect to the negligent hiring and supervision claims, this Court noted:
 "Next, the Copelands [the plaintiffs, who were the parents of Rex Copeland] alleged that Samford had negligently hired Slagle as its debate coach and thereafter had negligently supervised him. The record shows that the Copelands did not present substantial evidence that Samford should have, or that it could have, foreseen that *Page 1246 
Slagle would or might commit the murder."
686 So.2d at 196. With respect to the claim based on the doctrine of respondeat superior, this Court stated:
 "The Copelands contend that Slagle was acting within the line and scope of his employment when he murdered their son Rex. The question here is whether, at the time of the murder, Slagle was on Samford's business when he went to Copeland's apartment. If, as the Copelands argue, Slagle went to Rex's apartment to discuss Rex's performance during the practice debate, was there a deviation from his master's business thereafter? The trial court considered the murder to be a major deviation from the master's business, as a matter of law, and granted Samford's motion for summary judgment."
686 So.2d at 195.
The undisputed evidence in the present case indicated that J.B. and A.B. were not acting in the line and scope of their duties at the Center when they kidnapped the Hargroves' daughter. The evidence suggested that A.B. was preoccupied with the notion of having her own baby, even to the point of misleading DHR and Mahan into thinking that she was pregnant. The apparent plot hatched by the sisters to provide A.B. with a baby by kidnapping the Hargroves' daughter constituted, as a matter of law, a gross deviation from the Center's business; that fact precludes the imposition of liability upon the Center under the doctrine of respondeat superior for the actions of J.B. and A.B. Furthermore, the undisputed evidence indicated that there was nothing that should have, or could have, put Mahan or the Center on notice that the sisters would or might kidnap one of the children. Based on the holdings in N.J. v.Greater Emanuel Temple Holiness Church, supra, and Copeland v.Samford University, supra, we conclude that the summary judgment was proper as to count one (negligent hiring and supervision); count two (wanton hiring and supervision); count four (negligent or wanton failure to prevent the kidnapping); count five (the tort of outrage); count six (invasion of privacy — Sharda's claim); count seven (invasion of privacy — the Hargroves' claim); and count eight (respondeat superior). All of these counts were based on allegations that the Center breached a common law duty to the Hargroves and their daughter to prevent the kidnapping or that the Center was liable under the doctrine of respondeat superior for the kidnapping.
Count three of the Hargroves' complaint stated, in part:
 "The plaintiffs allege that on or about April 25, 1994, and prior thereto, they entered into a contract with the [Center], which is a day care facility, whereby for good and valuable consideration [$55.00 a week], the [Center] agreed to be entrusted with the care and custody of the plaintiffs' baby, Sharda, and the [Center] did, in fact, have Sharda in its care and custody at the time of her kidnapping. The agreement between the parties by its nature involved matters of mental solicitude.
 "On or about April 25, 1994, the [Center] breached said contract by engaging in acts or omissions, which include but are not necessarily limited to, the following:
 "(a) Failing to have Sharda at the day care when her mother . . . arrived at the [Center's] facility to pick her up;
 "(b) Failing to properly supervise its employees and/or agents;
 "(c) Putting Sharda in a position conducive to potential harm, including kidnapping;
 "(d) Allowing Sharda to get into the hands of underaged, unqualified, and incompetent persons;
". . . .
 "(f) Allowing people to have access to the day care and have responsibilities in the running of the day care center who were not appropriate persons for such access and/or responsibilities;
 "(g) Employing unqualified people at the day care and/or by allowing unqualified people to do the business of the day care;
 "(h) Failing to have a sufficient number of qualified persons on staff at all times to care for the babies and minor children entrusted to their care; *Page 1247 
 "(i) Failing to . . . properly set up operations to appropriately care for babies and minor children entrusted to their care;
 "(j) Failing to provide a safe place for the care and custody of babies and minor children entrusted to their care, such as Sharda; and,
 "(k) Failing to comply with state and other licensing requirements."
The Hargroves contend that there is sufficient evidence of an express contract and of a breach thereof to warrant submitting their breach-of-contract claim to a jury. The Center contends that there is no evidence of an express contract "to provide any level of care." We agree with the Hargroves.[4]
The evidence indicates that the Center expressly contracted with the Hargroves to care for their daughter on a daily basis for a sum certain per week. The evidence is sketchy with respect to the discussions Mahan had with the Hargroves when the contract was entered. However, reasonable inferences from the evidence indicate that the document entitled "Operating Policies" was provided to the Hargroves and that it was intended by the Center to become a part of the contract. That document, which incorporated the minimum standards imposed by DHR, stated that parents were expected "to read and follow the operating procedures" contained therein. Those operating procedures specifically obligated the Center 1) to release the Hargroves' daughter only to a properly authorized and identified person; 2) to employ only persons qualified (in accordance with DHR's minimum standards) to care for the Hargroves' daughter; 3) and to keep the Hargroves' daughter safe while she was under its care and supervision. The evidence indicates that unqualified and unauthorized persons (the sisters) removed the Hargroves' daughter from the Center's premises. The evidence also indicates that a qualified teacher or child care provider was not directly supervising the Hargroves' daughter at the time of her kidnapping. The basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement. Pinyan v. Community Bank, 644 So.2d 919 (Ala. 1994). We conclude that the plaintiffs presented sufficient evidence of these basic elements to submit to a jury their claim alleging the breach of an express contract.
The summary judgment is affirmed as to counts one, two, four, five, six, seven, and eight; however, it is reversed as to count three, and the case is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOOPER, C.J., and MADDOX, ALMON, SHORES, KENNEDY, and COOK, JJ., concur.
SEE, J., concurs in the result.
BUTTS, J., concurs in part and dissents in part.
[1] The defendant is also referred to in the record as "Tree of Life Day Care Center and Pre-School" and "Tree of Life Christian Child Care Center."
[2] Certain church-affiliated child care programs are exempt from state licensing requirements. Ala. Code 1975, § 38-7-3.
[3] The Center contends that the sisters were not employees. Although there is evidence to support that contention, there is also evidence that the girls worked at the Center; that the Center kept up with the hours that they worked; and that the girls received money from Mahan.
[4] The Center also argues that the Hargroves have no claim for the breach of an implied agreement to exercise reasonable care. Relying on Brown v. Schultz, 457 So.2d 388 (Ala. 1984); Watersv. American Casualty Co., 261 Ala. 252, 73 So.2d 524 (1954); and Mosley v. Jefferson County Board of Education,677 So.2d 776 (Ala.Civ.App. 1995), the Center contends that when a contract does not in terms require reasonable care in doing the act stipulated to be done, the law imposes a duty, but does not imply a contract, to exercise due care in doing the act. Therefore, the Center argues, when negligence exists in doing that act, only an action in tort is available, because there is no express or implied contract that is breached. The Hargroves do not argue on appeal that they have a contract claim for the breach of an implied agreement. Therefore, we find it unnecessary to address this issue.