[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11558
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-00880-VEH

JOSHUA EMERY,

Plaintiff - Appellant,

versus

TALLADEGA COLLEGE,
A Domestic Corporation,
BILLY C. HAWKINS,
JACQUELINE W. PADDIO,
MIGUEL A. BONDS,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(May 16, 2017)

Before MARCUS, JORDAN, and JULIE CARNES, Circuit Judges.

PER CURIAM:

## I.    BACKGROUND

Plaintiff Joshua Emery was a freshman at Defendant Talladega College in the fall of 2012.  Defendants Billy C. Hawkins, Jacqueline W. Paddio, and Miguel A. Bonds are administrators at Talladega College.

On October 12, 2012, Plaintiff was walking to meet other students at the campus chapel.  On the way, he walked past three local individuals who were "looking at [him] kind of strange like he had a problem," but Plaintiff noticed that they "had a bottle sitting next to them" so he simply continued on to the chapel.  When Plaintiff got to the chapel, he saw that the other students were all dancing, but because he did not feel like dancing, he decided to head back to his dorm.

On the way back, the three local individuals were still sitting there and one of them was looking at plaintiff like he was mad, so Plaintiff said to him, "What's up."  The man responded, "What's up, what you mean, you want to fight," but the two other men with him grabbed him and stopped him.  Plaintiff walked off, but the men began to follow him, so Plaintiff called a friend to come meet him.  Plaintiff's friends arrived, and he and his friends exchanged heated words with the three local individuals.  One of the local individuals got on the phone, and soon a black Dodge Charger pulled up.  Out of the Charger stepped a man with his hands

2

in his pants.  The man pulled a bottle out of his pants and put that bottle in his car, but then took a gun out of his car, flashed it, and put the gun in his pants.  Plaintiff and his friends backed up when they saw this, at which point campus police officers passed by the scene.  Upon seeing the police officers, the local individuals all jumped into the Charger and drove away.

The campus police came over to Plaintiff and his friends, and someone in the group told the police officers what had just happened.  Plaintiff and his friends then went to a convenience store, where they saw another police officer whom Plaintiff informed what had just happened, what the man in the Charger was wearing, and where they appeared to have gone.  The officer told Plaintiff to go back to campus.

As Plaintiff returned to campus with three other classmates, a number of local individuals came from behind a nearby church and began cursing at Plaintiff and his classmates, calling them names.  Plaintiff and one of his classmates exchanged their own remarks, and decided to continue on to their dorm—Crawford Hall.  As Plaintiff and his classmates continued toward Crawford, the local individuals reappeared and followed them.  Once inside the dorm, one of the local individuals who had been following Plaintiff tried to snatch open the door to the dorm, but another student prevented this.  Rather than remain inside, however, Plaintiff and his classmates decided they should defend themselves.  So they

opened the door from the inside, and Plaintiff and the other students began fighting the local individuals on the dorm porch and out into the street.

Talladega College Police Officer Lindsey arrived on the scene and used mace to break up the fight. The local individuals dispersed, and Officer Lindsay escorted the students back inside Crawford Hall, instructing them to stay near the dorm. Isaiah Carter, the dorm manager, kept the students in the dorm for about five minutes, then told them they were free to go back out onto the dorm porch, if they wanted. Plaintiff and at least one other individual went out onto the dorm porch and hung out there for five to ten minutes. While they were out there, an individual in a hoodie walked by the porch; the individual told Plaintiff "to come here;" Plaintiff responded, telling the individual "to come here." The individual walked off and disappeared. A bit later, Plaintiff heard gunshots, jumped up, ran back inside, and realized that he had been shot. Because the shots were fired from a location across the street from the dorm, Plaintiff did not know who the shooter was nor did he see him.

Plaintiff sued Defendants alleging that they were negligent under Alabama law because they failed to protect Plaintiff from this shooting and from criminal activity in general. After a period of discovery, Defendants filed a motion for summary judgment. Plaintiff filed two motions for sanctions alleging that Defendants failed to turn over potentially spoliated evidence. After briefing, the

4

district court granted Defendants' motion for summary judgment and denied Plaintiff's sanctions motions as moot.  Plaintiff appeals these decisions.

## II.    SUMMARY JUDGMENT

We first address the merits of the district court's summary judgment ruling in favor of Defendants.  We review *de novo* a district court's grant of summary judgment, viewing all facts and reasonable inferences in the light most favorable to the nonmoving party.  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999).  Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*

In arguing that Defendants are liable for his injury, Plaintiff first relies on the Clery Act, which is a federal statute that requires American colleges and universities to disclose statistics and information relating to crime in and around their campuses.  Under the Act, colleges and universities are required to publish and distribute annual campus crime reports to students and employees, keep logs of reported crimes and records of crime statistics, and provide timely warnings to students and employees of recent crimes that represent a threat to the safety of students or employees.  Plaintiff cites to 20 U.S.C. § 1092(f), which outlines the various "campus crime statistics and campus security policies" that colleges and

universities must "prepare, publish, and distribute" to current students, prospective students, and employees each year.

The Clery Act, however, expressly states that it does not create a private cause of action against any college, university, or employee,[1] 20 U.S.C. § 1092(f)(14)(A)(i). Nevertheless, Plaintiff asserts that the Act creates a duty to warn and to protect that can be enforced through a state-law negligence action. Plaintiff seems to be implicitly asserting a *negligence per se* theory, with the Clery Act establishing a statutory standard of care, the violation of which would result in negligence. *See Parker Bldg. Servs. Co., Inc. v. Lightsey ex rel. Lightsey*, 925 So.2d 927, 930–31 (Ala. 2005) ("The doctrine of negligence per se or negligence as a matter of law arises from the premise that the legislature may enact a statute that replaces the common-law standard of the reasonably prudent person with an absolute, required standard of care. When the legislature adopts such a statute, anyone who violates it and causes an injury to a person whom the statute was

---

[1] As the statute states: "Nothing in this subsection may be construed to—(i) create a cause of action against any institution of higher education or any employee of such an institution for any civil liability; or (ii) establish any standard of care." 20 U.S.C. § 1092(f)(14)(A). Courts have acknowledged that the Act does not a create a private cause of action. *See, e.g., Doe v. United States Dep't of Health & Human Servs.*, 85 F. Supp. 3d 1, 10–11 (D.D.C. 2015); *Moore v. Murray State Univ.*, No. 5:12-CV-00178, 2013 WL 960320, at *3 (W.D. Ky. Mar. 12, 2013); *King v. San Francisco Cmty. Coll. Dist.*, No. C 10–01979 RS, 2010 WL 3930982, at *4–5 (N.D.Cal. Oct. 6, 2010); *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 760 (E.D.Tenn. 2009); *see also* Brett A. Sokolow, *et al., College and University Liability for Violent Campus Attacks,* 34 J.C. & U.L. 319, 344 (2008) ("[T]he Clery Act specifically notes that it cannot give rise to a private right of action to enforce its terms. . . . The enforcing authority for the Clery Act violation is the U.S. Department of Education.").

intended to protect is liable for negligence per se.") (citation omitted).  But obviously Plaintiff's theory has no legs, given the statute's explicit and unequivocal disclaimer that nothing in the reporting requirements "may be construed to . . . (ii) establish any standard of care."[2]  20 U.S.C. § 1092(f)(14)(A)(ii).  In short, although the Clery Act imposes legal obligations on institutions of higher education, a private plaintiff cannot enforce these obligations through a negligence action.

Instead, Plaintiff can succeed on his claim only by showing that Defendants owed him a duty under Alabama tort law.  *New Addition Club, Inc. v. Vaughn*, 903 So.2d 68, 76 (Ala. 2004) ("A negligence action cannot be maintained without a showing that the defendant owed the plaintiff a duty.")  "In Alabama, the existence of a duty is a strictly legal question to be determined by the court." *Bryan v. Ala. Power Co.*, 20 So.3d 108, 116 (Ala. 2009) (quotation marks omitted).  As such, the existence or nonexistence of a duty may be properly resolved at the summary judgment stage.  *See State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834, 837–39

---

[2]  Plaintiff has cited no case that applies the Clery Act to create a private cause of action.  *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25 (1st Cir. 2007), which Plaintiff does cite, does not change the analysis.  In *Havlik* the student-plaintiff sued a university-defendant for defamation, alleging that the university's disclosure of an allegedly false crime alert was defamatory.  Under Rhode Island Law, an alleged-defamer has a qualified privilege against liability if the alleged-defamer reasonably believed that it had a legal duty to publish the allegedly-defamatory statement.  The *Havlik* court analyzed whether a university-defendant had such a reasonable belief that it was required to publish the crime alert at issue under the Clery Act.  The court concluded that the university *did* have such a reasonable belief, thus defeating the plaintiff's defamation claim.  In short, *Havlik* has nothing to do with the proper standard of care under negligence law, and thus nothing to do with this case.

(Ala. 1999) (observing the conflicting Alabama case law regarding whether the existence of a duty should be resolved by judge or jury and ultimately holding "that the existence of a duty is a question of law to be determined by the trial judge").

Plaintiff's Complaint alleges that "Defendant Talladega College owed a duty of reasonable care to protect its students from harm, such as that suffered by Plaintiff Joshua Emery." Yet, in Alabama "[i]t is well settled that absent a *special relationship* or *special circumstances*, a person has no duty to protect another from criminal acts of a third person"—such as the shooting at issue in this case. *Baptist Mem'l Hosp. v. Gosa*, 686 So.2d 1147, 1149 (Ala. 1996) (emphasis added). So, the question here is whether a special relationship or special circumstances existed.

### A.    "Special Circumstances"

Plaintiff first argues that "special circumstances" existed because the history of crime around Talladega College and the specific interactions between Plaintiff and the local individuals rendered the later shooting foreseeable. "'Special circumstances' arise when the defendant knew or had reason to know of a *probability* of conduct by a third person that would endanger the plaintiff." *Tenn Tom Bldg. v. Olen, Nicholas & Copeland, P.C.*, 908 So.2d 230, 233 (Ala. 2005) (quoting *Hail v. Regency Terrace Owners Ass'n*, 782 So.2d 1271, 1274 (Ala. 2000)) (quotations and alterations omitted). Under this standard, to impose a duty

upon a person for the criminal actions of another, (1) "the particular criminal conduct must have been foreseeable," (2) "the defendant must have possessed 'specialized knowledge' of the criminal activity," and (3) "the criminal conduct must have been a *probability.*"  *Id.* (quoting *Carroll v. Shoney's, Inc.*, 775 So.2d 753, 756 (Ala. 2000)).  Essentially, these factors speak to one central question: was the plaintiff's injury sufficiently foreseeable by the defendant premises owner, such that there was a duty for the defendant to try to prevent the harm.  *See Hail v. Regency Terrace Owners Ass'n*, 782 So.2d 1271, 1274–76 (Ala. 2000) ("[T]hese cases present a question of foreseeability. . . . [I]f a criminal attack upon an invitee by a third person is reasonably foreseeable to the premises owner, the law imposes on the premises owner a duty to take reasonable precautions to protect against it") (citations omitted); *Ex parte S. Baldwin Reg'l Med. Ctr.*, 785 So.2d 368, 370 (Ala. 2000) ("In any case in which a defendant faces liability for the criminal actions of a third party, the focus is on whether the criminal activity was foreseeable"); *Gosa*, 686 So.2d at 1150 ("The key here is foreseeability.") (quotation marks omitted).

A history of sporadic criminal activity in a given area, however, is not enough to give a landowner a duty to protect a plaintiff from third party criminal acts—even if this sporadic criminal activity shows that the specific location is particularly prone to criminal activity.  *See Moye v. A.G. Gaston Motels, Inc.*, 499 So.2d 1368, 1373 n.1 (Ala. 1986) (stating that evidence that one murder and one

9

robbery of a guest in a hotel room in the 18 months preceding the homicide of the plaintiff "would be insufficient as a matter of law to give rise to a duty to protect [the plaintiff]"); *Ortell v. Spencer Companies, Inc.*, 477 So.2d 299, 300 (Ala. 1985) (holding that a convenience store owner's notice of five robberies, one assault with a weapon, one theft, and one burglary on the premises in a three-year period was not sufficient to impose a duty to protect an employee from criminal activity); *Henley v. Pizitz Realty Co*., 456 So.2d 272, 277 (Ala. 1984) (holding that a parking garage owner's notice of one battery upon an owner of a car, six incidents of breaking and entering of cars, two robberies, and seven thefts over a ten year period was insufficient to give rise to a duty to protect a customer who was abducted from the parking deck and raped); *see also Saccuzzo v. Krystal Co*., 646 So.2d 595, 596–97 (Ala. 1994) (Even though "[i]n the 18 months preceding the shooting of [plaintiff], the police had been called to [defendant's] restaurant more than 160 times," this "extremely high level of criminal activity at [the restaurant] . . . could not impute knowledge to [defendant] of the probability of a criminal attack on [plaintiff].").

Plaintiff points, in general terms, to a history of criminal activity on Talladega College's campus and prior incidents involving local residents, but as these cases show, this history of sporadic criminal activity is not enough to bring this case under the "special circumstances" exception. Plaintiff would need to

show that Defendants' campus was so regularly and recurrently dangerous for individuals like Plaintiff that Defendants "knew or had reason to know of a probability of conduct by third persons that would endanger the plaintiff." *Saccuzzo*, 646 So.2d at 596–97 (quotation marks omitted). Plaintiff has not made such a showing here.

Plaintiff also argues, however, that the specific events involving Plaintiff in the few hours leading up to the shooting made the later shooting foreseeable, such that Defendants acquired a duty of care to Plaintiff. Plaintiff first argues that Defendant could have foreseen him being shot because he had already been "assaulted" by local residents twice before (on his way back from the chapel and during the fight with the local individuals), and thus a third "assault" (the shooting) should have been expected. Plaintiff is correct that "a common factor" used by Alabama courts to determine "if a particular act is in fact foreseeable is the prior criminal incidents occurring at the premises and which the premises owner was aware of or should have been aware of." *Gosa*, 686 So.2d at 1150 (quoting *Moye*, 499 So.2d at 1370); *see also Hail*, 782 So.2d at 1274 ("[W]hile prior incidents of criminal conduct can indicate the premises owner or manager had notice that someone on the premises could be harmed by the criminal act of a third person, proof of prior criminal acts does not conclusively establish such notice"). However, Plaintiff's reliance on the specific *criminal classification* of the conduct

11

at issue—"assault"—is misplaced.  Essentially, Plaintiff argues that (1) the district court should have accepted his legal classification of the incidents between Plaintiff and the local residents and (2) if a series of incidents falls under the umbrella of the same general criminal definition, further incidents falling under that same criminal definition are foreseeable.

The foreseeability of a given act, however, does not revolve around that act's legal classification, but the facts surrounding the act.  "The number and frequency of prior criminal acts at the place where the injury occurred are used in determining whether a particular criminal act was reasonably foreseeable" because such records can serve as "objective, verifiable criteria," *Gosa*, 686 So.2d at 1152 (quotation marks omitted), but the mere presence of similarly classified crimes certainly does not make all future crimes falling into the same criminal category necessarily "foreseeable."  It is the "particular criminal *conduct*," that must be foreseeable, *see id.* at 1150; a pattern of unrelated but similarly classified crimes does not meet this showing.

Further, this is not a situation where the University "was given actual, express, and specific notice that a specific person might attempt to commit a criminal act against another specific person." *Gosa*, 686 So.2d at 1151 (describing *Thetford v. City of Clanton*, 605 So.2d 835 (Ala. 1992)).  In *Thetford*, the plaintiff checked into a hotel to get away from her abusive husband, registered for the room

12

under an assumed name, and specifically told the hotel employees not to tell her husband that she was staying there. 605 So.2d at 836–37. However, when her husband later arrived at the hotel, the hotel employee cut the chain locking plaintiff's room and allowed the plaintiff's husband access to her room; the husband took the plaintiff from the hotel and murdered her. *Id.* at 837. This "actual, express, and specific notice" of foreseeable criminal activity was enough to show "special circumstances" creating a duty of care to protect the plaintiff. *Gosa*, 686 So.2d at 1151 (describing *Thetford*, 605 So.2d at 835).

However, no such explicit notice is presented in this case. Though Plaintiff was involved in two previous altercations with local individuals (one verbal and the other a physical fist fight) prior to the shooting, the university never received any specific, actual notice that a shooting was imminent. *See Nail v. Jefferson Cty. Truck Growers Ass'n, Inc.*, 542 So.2d 1208, 1211 (Ala. 1988) (holding that special circumstanced *were* present because defendant was aware that for several weeks hostility had grown between two tenants at a farmers' market and defendant had received two specific warnings that an outbreak of violence was imminent), *cited in Finley v. Patterson*, 705 So.2d 826, 829 (Ala. 1997). Indeed, the University did not have express notice that *any* subsequent criminal activity was imminent after Officer Lindsey intervened, broke up the brawl outside of the dorm, and dispersed the local hooligans. Officer Lindsey went off to pursue the local individuals

13

involved in the brawl, which seems to have been a wise proactive measure, and no doubt was hoping to deter further criminal activity. No University official had any kind of particularized or specific notice that a shooting would later occur.

Plaintiff argues that, even absent express notice, the combination of prior interactions between Plaintiff and the local individuals on the day of the shooting should have rendered the eventual shooting a foreseeable probability, sufficient to impose a duty upon Defendant. However, Alabama Supreme Court precedent makes clear "that the *particular* criminal activity, not just any criminal activity, must be foreseeable." *New Addition Club, Inc.*, 903 So.2d at 75 (emphasis in original). For sure, Plaintiff was followed home by a group of local individuals, after which he and his classmates left the safety of their dorm to fight these individuals, but there is no evidence that guns or other weapons were used during this fight. Thereafter, Officer Lindsey intervened to break up the fight and dispersed the local individuals. On these facts, Plaintiff has not shown that the University should have foreseen the subsequent *shooting* of Plaintiff, that this shooting was a "probability," and that Defendants therefore had a duty to prevent it.

Several cases elucidate the strictness with which Alabama law examines the existences of special circumstances. In *Carroll v. Shoney's, Inc.*, the Alabama Supreme Court explained how prior recent threats and beatings did not render a

14

premise-owner liable for a later shooting "because that particular criminal conduct was not foreseeable." *New Addition Club, Inc.*, 903 So.2d at 73 (describing *Carroll*, 775 So.2d at 756–57). The plaintiff in *Carroll* had been beaten, choked, and threatened by her husband one night, and the next day at work, informed her restaurant employer of these incidents and asked that her employer telephone the police if her husband appeared at the restaurant that evening. *Carroll*, 775 So.2d at 754. Around 10:00 that night, the plaintiff's husband did appear at the restaurant, pushed his way into the back of the restaurant where plaintiff was working and yelled that he was going to "get her"; Plaintiff's employer called the police and police escorted the husband from the property. *Id.* Plaintiff, however, was scared to return home, so her co-workers put her up in a motel for the night. *Id.* The next day, plaintiff called her employer and said that she was afraid to return to work, but her employer told her that she should come into work anyway. *Id* at 754–55. While plaintiff was at work, her husband came to the restaurant, pulled out a pistol, and shot plaintiff in the back of the head, killing her. *Id.* Notwithstanding the recent violence between the plaintiff and her husband at this same location, the Alabama Supreme Court held that, since "[t]he particular criminal conduct in this case was a murder" the employer could not be liable for the criminal acts of the husband because there was no way that "[the employer] should have reasonably

15

foreseen that [the husband] would enter the Captain D's restaurant and murder his wife." *Id.* at 757.

Likewise, in *New Addition Club, Inc. v. Vaughn*, plaintiff was in a nightclub where two other patrons got into an argument on the dance floor. 903 So.2d 68, 69 (Ala. 2004). As the argument escalated, the two arguing patrons stepped outside the nightclub with a crowd of other patrons in tow. *Id.* One patron, Crenshaw, attacked another patron, and soon others intervened. After the fight was stopped, Crenshaw went to his car, got a gun, and fired it, killing plaintiff. *Id.* Plaintiff's representative introduced evidence that "there had been prior incidents at the New Addition Club involving patrons fighting; there had in fact been one shooting on the premises; Crenshaw had once driven his car up to the door of the club and 'got out and pulled a shotgun,' resulting in Crenshaw's being banned from the club; Crenshaw had once punched his girlfriend while they were in the parking lot of the club; and [the nightclub's owner] agreed that he knew Crenshaw was 'hot tempered.'" *Id.* at 75 (internal footnotes omitted). The Alabama Supreme Court recognized that "in order to prove that the Club owed Mary Vaughn a duty to protect her from the actions of Crenshaw, the Vaughns must show: (1) that it was foreseeable that Crenshaw would shoot and kill Mary, (2) that the Club had specialized knowledge that a killing of this type could occur, and (3) that the killing was a probability." *Id.* (internal footnotes omitted). In spite of the

16

escalating fight, Crenshaw's previous incidents, and the prior instances of violence, the court held that it was not foreseeable that Crenshaw would kill Mary Vaughn (or that the killing was a probability). *Id.* at 75–76 ("[N]othing suggests that the Club knew, or had reason to know, that Crenshaw would kill Mary. The 'particular criminal activity not just any criminal activity,' must be foreseeable") (quoting *Ex parte S. Baldwin Reg'l Med. Ctr.*, 785 So.2d at 370).

Finally, in *Baptist Mem'l Hosp. v. Gosa*, the Alabama Supreme Court applied the same "particular criminal activity" consideration to a series of criminal incidents over a longer period of time. 686 So.2d 1147 (Ala. 1996). The plaintiff was shot in defendant's parking lot as she was leaving work, and presented evidence that there were fifty-seven reported criminal incidents around the parking lot in the previous five years. *Id.* at 1152. The court noted, however, that "approximately 48 of those incidents involved either thefts of a vehicle or thefts from a vehicle in which the suspect was never seen and in which the suspect never assaulted or threatened the owner or driver of the vehicle. Of the remaining nine incidents, six—including the incident in this case—involved a physical touching. Of those six crimes, only one crime—the crime in this case—involved a gun." *Id.* In light of this distinction, the court concluded that plaintiff's shooting "could not be considered reasonably foreseeable." *Id.* at 1153.

17

The lesson from these cases is, as stated above, "that the *particular* criminal activity, not just any criminal activity, must be foreseeable." *New Addition Club, Inc.*, 903 So.2d at 75 (emphasis in original). Further, the temporal proximity of the present events—all occurring within an hour or two—does not necessarily render the later shooting foreseeable, either. *See Carroll*, *supra*.

Finally, it is difficult to infer that the shooting of Plaintiff was foreseeable to Defendants when it obviously was not foreseeable to Plaintiff, who was much better acquainted with any risks than were Defendants, and who was in a position to avoid those risks. Specifically, when Plaintiff took it on himself to leave his dorm and fight the locals, he obviously wasn't worried about being shot. Likewise, after the fracas was broken up by the police, Plaintiff was again apparently unconcerned, as he chose to return to the dorm porch, where he was later shot. In all, Plaintiff has not shown that the shooting was foreseeable to Defendants or was probable, as required to create "special circumstances" imposing a duty on the Defendants. *See Carroll*, 775 So.2d at 758 n.2 ("[T]his Court stated that it has consistently and vigorously affirmed summary judgments in favor of the defendant premises owner/employer on the issue of whether the defendant was negligent in failing to protect its invitee/employee from such crimes." (internal quotations omitted)); *Hail*, 782 So.2d at 1274–75 ("This Court has rarely held that the danger to an invitee posed by the potential criminal act of a

third person was so imminent that the premises owner should have foreseen the eventual consequence."); *Finley v. Patterson*, 705 So.2d 826, 829 (Ala. 1997) ("In the overwhelming majority of cases presenting the question, we have not found special circumstances that give rise to a duty to protect.").

### B.    Special Relationship

Plaintiff's next contention is that by ordering the students to go inside Crawford Hall after the fight, but then allowing them to return to the porch five minutes later, Defendant Talladega's dorm manager created a "special relationship" that triggered a duty by Defendants to protect the students from the later criminal act of the shooter.  The Alabama Supreme Court has not specifically delineated the contours of the "special relationship" exception, but it has recognized that a special relationship arises when a person is "uniquely dependent upon the [defendant] for protection." *Saccuzzo*, 646 So.2d at 597 (citing *Young v. Huntsville Hosp.*, 595 So.2d 1386 (Ala. 1992)).  However, the court has only applied this exception in the rare case where the plaintiff is wholly at the mercy of the defendant to keep him safe from harm. *Compare Young*, 595 So.2d 1386 (recognizing a special relationship between a hospital and a heavily sedated patient after the patient was sexually assaulted by a person who had been seen wandering around the hospital on previous occasions); *Thetford*, 605 So.2d 835 (highlighting a special relationship between an inn-keeper and a guest who checked into a hotel

19

room to get away from her abusive husband and specifically told the hotel employees not to tell her husband she was staying there, after the hotel employee cut the chain to the guest's room and allowed the husband into the room),[3] *with Ex parte S. Baldwin Reg'l Med. Ctr.*, 785 So.2d 368, 369 (Ala. 2000) (holding that no special relationship existed where the six-year-old plaintiff was sexually molested by a nurse at defendant's hospital because, even though none of the family members immediately witnessed the improper touching, several family members were in the room with the nurse and the plaintiff at the time of the molestation); *Hargrove v. Tree of Life Christian Day Care Ctr.*, 699 So.2d 1242, 1244 (Ala. 1997) (holding that no special relationship existed where the plaintiff's one-month-old daughter was kidnapped from a church day-care program);[4] *Habich v. Crown Cent. Petroleum Corp.*, 642 So.2d 699, 700 (Ala. 1994) (holding that no special

---

[3] As noted above, *Thetford* actually based its holding on the "special circumstances" exception rather than the "special relationship" exception. However, subsequent Alabama Supreme Court cases have recognized *Thetford* as an example of the "special relationship" exception as well. *See Saccuzzo*, 646 So.2d at 597 ("[In *Thetford* t]his Court reversed, holding that 'special circumstances' in that case made the summary judgment inappropriate. Although the Court did not specifically say so, the innkeeper-guest relationship in *Thetford* also comes within the 'special relationship' exception to the general no liability rule.").

[4] Similarly to the way *Thetford* has been expanded to the "special relationship" realm, in *Hargrove* the Alabama Supreme Court relied upon a prior precedent that was not explicitly a "special relationship case." Specifically, *Hargrove* relied upon *N.J. v. Greater Emanuel Temple Holiness Church*, 611 So.2d 1036 (Ala. 1992), in which plaintiff, a minor child who was in a church day care program, was raped on the church premises by her second cousin who lived on the church premises. *Hargrove* concluded, "[i]mplied in the holding of that case is that there were no special circumstances or special relationships that would give rise to a duty on the church's part to take additional steps to protect [the *N.J.* plaintiff]. This present case is materially indistinguishable from *N J*."

20

relationship existed where plaintiff worked an early morning shift at a 24-hour convenience store alone, and was not allowed to lock the door while she restocked the shelves); *Saccuzzo*, 646 So.2d at 596 (holding that no special relationship was created by the fact that, "[i]n the 18 months preceding the shooting of [plaintiff], the police had been called to the [location of the shooting] more than 160 times.").

Unlike the plaintiffs in *Thetford* and *Young*, Plaintiff in this case was not "completely dependent upon the defendants for protection." *Finley*, 705 So.2d at 828. Plaintiff was told that he could go out to the Crawford Hall porch after about five minutes inside Crawford Hall, but he was not required to do so. Plaintiff could have gone up to his room, stayed in the lobby of Crawford, or even tried to leave the building. He was neither incapacitated, helpless, nor completely dependent upon Defendant's intervention or protection to prevent the harm here. This case therefore does not fall into the narrow "special relationship" exception recognized by the Alabama Supreme Court.

## C.    General Duty of Safety under *Collins*

Finally, plaintiff posits that the Alabama Supreme Court's decision in *Collins v. Scenic Homes, Inc.*, 38 So.3d 28 (Ala. 2009) supports his claim that Defendants breached a duty to keep the college safe from criminal activity,

generally.[5]  In *Collins*, an arsonist started a fire in an apartment complex that injured plaintiff.  The defendant landlord relied on the body of case law limiting tort liability for third-party criminal acts (as discussed above), but the court distinguished these cases based on the defendant's independent "duty to construct and . . . a duty to operate a reasonably safe apartment building, equipped with appropriate exits and fire-suppression safeguards designed to reduce the risk of injury as a result of a fire, regardless of the origin of the fire." *Id.* at 33.  This duty was drawn from a premise-owner's general "duty to reasonably guard against the risk of fire." *Id.* (*citing Mozer v. Semenza*, 177 So.2d 880, 883 (Fla. Dist. Ct. App. 1965)).  Thus, given this duty, the apartment-builder and apartment-owner defendants had a duty to mitigate the risk of fire damage, whether that risk emanated from the possibility of a criminal act by an arsonist or from a less nefarious cause.

Plaintiff argues that, in the same way, Defendants here had a general duty to keep the university free from criminal activity, regardless of whether a plaintiff has shown special circumstances or a special relationship, as set out above.  But *Collins* does not identify any such duty for colleges and universities, above and

---

[5]  According to Plaintiff, these claims allege "breaches of duty related to Talladega College's general failure to keep the campus safe; failing to appropriately respond to earlier incidents; failure to follow emergency procedures; failing to provide adequate security; failure to provide adequate safety and communication equipment, including working patrol radios and warning systems; failure to properly maintain emergency equipment; and failure to report prior instances of criminal conduct."

22

beyond what any landlord owes its tenants, and Plaintiff has offered no legal support for this assertion.

## III.    MOTIONS FOR SANCTIONS

Plaintiff also asks this court to reverse the District Court's denial of his two motions for sanctions on mootness grounds following the dismissal of Plaintiff's claims.  "We review the district court's decision regarding spoliation sanctions for abuse of discretion." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 (11th Cir. 2005).

Of course, "an appellate court does not have jurisdiction under the Article III 'case or controversy' provision of the United States Constitution to decide questions which have become moot by reason of intervening events." *C & C Products, Inc. v. Messick*, 700 F.2d 635, 636 (11th Cir. 1983).  Thus, to the extent that Plaintiff's motion for sanctions sought some kind of discovery order or trial-related sanctions, the dismissal of Plaintiff's case (pursuant to Defendant's summary judgment motion) renders these motions moot.

Plaintiff seems to assert that the district court erred in ruling on the summary judgment motion prior to ruling on the spoliation/sanctions motions because Plaintiff's success on the sanctions motion could have affected Plaintiff's ability to survive summary judgment. Plaintiff, however, has not fleshed out this argument before us and instead requests that we look at the original motions filed with the

23

district court to "understand the impact" of the non-disclosure on his case. "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

At any rate, we disagree that the requested evidence would have altered the district court's or our decision that  Defendants' motion for summary judgment should have been granted.

## IV.    CONCLUSION

We **AFFIRM** the district court's order granting summary judgment for Defendants and denying Plaintiff's motions for sanctions as moot.